# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Perez*, 2012 IL App (2d) 100865

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS R. PEREZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0865 |
| Filed | May 8, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated criminal sexual abuse were affirmed, where the issues were not complex and the other-crimes evidence that was admitted was more probative than prejudicial, provided context for the charges, was not unduly inflammatory or excessive, and was admissible under section 115-7.3 of the Code of Criminal Procedure without limitation, the trial court instructed the jury before deliberations that the other-crimes evidence could be considered only for limited purposes, the jury was adequately apprised of the difference between charged and uncharged conduct, and defense counsel's conduct was not objectively unreasonable. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-CF-630; the Hon. Theodore S. Potkonjak, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas A. Lilien and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justice Hudson concurred in the judgment and opinion.<br>Justice McLaren specially concurred, with opinion. |

## OPINION

¶ 1     Defendant, Jesus R. Perez, appeals his convictions of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i), (ii) (West 2008)) related to victim S.C. Defendant argues that the trial court permitted, under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2008)), excessive other-crimes evidence to be introduced at trial. Further, defendant argues that inadequate limiting instructions, jury instructions, and verdict forms rendered the jury verdict unreliable in that it was potentially based on evidence of uncharged conduct. Alternatively, defendant argues that his trial attorney provided ineffective assistance where he failed to request limiting instructions when the other-crimes evidence was introduced at trial, and where he failed to request jury instructions and verdict forms that distinguished between charged and uncharged conduct. For the following reasons, we affirm.

¶ 2                          I. BACKGROUND
¶ 3                          A. Pretrial Rulings
¶ 4     On October 22, 2008, the State charged defendant with four counts of aggravated criminal sexual abuse; two charges pertained to alleged victim S.C., and two charges pertained to alleged victim D.W. As to S.C., the indictment charged that, on or before June 1, 2006, and November 30, 2007, defendant, age 17 or older, committed aggravated criminal sexual abuse against S.C., who was under age 13, in that he, for purposes of sexual gratification: (1) "fondled the breasts"; and (2) "pushed his penis against the buttocks" of S.C. On May 28, 2009, the court granted defendant's motion to sever defendant's trials, with one trial as to each victim.

¶ 5     On September 9, 2009, the trial court (Judge John T. Phillips) heard argument on the

State's motion *in limine* to introduce other-crimes evidence pursuant to section 115-7.3 of the Code.[1] Specifically, in addition to the charged acts against S.C., the State wished to present evidence of other acts that defendant allegedly perpetrated against her. Further, the State wished to introduce evidence regarding the acts that defendant allegedly perpetrated against D.W. Over defendant's undue-prejudice objection, the court granted the State's motion. Specifically, the court, discussing relevant case law (*People v. Donoho*, 204 Ill. 2d 159 (2003); *People v. Cardamone*, 381 Ill. App. 3d 462 (2008)), and stating that it had weighed the evidence's probative value against its prejudicial effect, determined that the statute and case law permitted introduction of the evidence. The court refused to place a "false limitation" on the evidence, but it instructed the State to "talk about your best three or pick your best four, and I believe that the case law is such that surrounding circumstances do in fact become relevant." The court instructed the parties to prepare arguments regarding the necessity, if any, of limiting instructions; the court stated that it wished to be prepared to issue, if necessary, *sua sponte* limiting instructions when the evidence was introduced at trial.

¶ 6                                                    B. Trial

¶ 7        On May 24, 2010, trial commenced before a different judge (Judge Theodore S. Potkonjak).[2] During *voir dire*, the court informed potential jurors that defendant was charged with aggravated criminal sexual abuse that occurred on or before June 1, 2006, and *January 20, 2007* (a date different from that listed in the indictment, but which reflects the date that S.C. turned age 13). After the jury was selected, the following colloquy occurred between the court and defense counsel:

"COUNSEL: Judge, prior to jury selection you didn't read them the indictment. I presume you are going to do that before you swear them in.

THE COURT: I am not going to read them the indictment.

COUNSEL: Judge, we are going to ask that the indictment be read to them before hearing evidence. We are going to give reference to the charges in our opening statement. If they don't have it–haven't heard what the actual charges are–

THE COURT: They are not going to be read the indictment. They will never be read the indictment.

COUNSEL: Just let the record reflect that we request that the jury be read the

---

[1]Section 115-7.3 of the Code provides that, when a defendant is accused of aggravated criminal sexual abuse, evidence of the defendant's commission of another sexual offense "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing *on any matter* to which it is relevant." (Emphasis added.) 725 ILCS 5/115-7.3(a)(1), (b) (West 2006).

[2]It does not appear from the record that the parties ever briefed or argued, before either judge, the necessity, if any, of limiting instructions.

indictment."[3]

Later, the court similarly ruled that, because the jury would be instructed on the law at the end of trial, defense counsel was not permitted to read the indictment to the jury during his opening statement.

¶ 8    In opening statements, the State discussed the evidence the jury would hear but did not distinguish the acts that formed the basis of the charges from the other-crimes evidence. Similarly, defense counsel did not state what specific acts defendant was charged with committing; however, he did inform the jury that the trial and the evidence pertained only to S.C., not D.W.

¶ 9    S.C. (age 16 at trial) testified that she was born on January 20, 1994. She lives with her parents and siblings, including her mother, Grace, and her brother, Errol (who is one year older than S.C.). In addition, S.C. has an older sister, Josephine (age 33), who resides in another home. D.W. is Josephine's daughter (in other words, S.C. is D.W.'s aunt). S.C. is three years older than D.W., and the girls are close friends. After a divorce, Josephine and defendant entered into a relationship. S.C. believed that she was eight years old when Josephine and defendant began dating. S.C. had contact with defendant at various family events, including barbecues and family vacations. Defendant often purchased gifts for S.C. on vacations or at amusement parks; S.C. viewed him like a brother.

¶ 10    In the summer of 2006, when S.C. was 12 years old, her relationship with defendant changed. When on a trip to Silver Lake, Wisconsin, defendant pulled S.C. into the water, to a depth where she could not stand, put his arms around her chest from behind and rubbed her breasts with his hands. This occurred more than five times. Errol was nearby, but the water was murky and one could not see through it. S.C. swam away and got out of the water. On their way home from the trip, when Errol was asleep in the passenger seat and D.W. was asleep on S.C.'s lap, defendant asked S.C. if the way he was touching her made her feel uncomfortable. She told him that it did. He told her that he would stop.

¶ 11    In the summer of 2006, S.C. often stayed overnight at Josephine's house; she would sleep in D.W.'s room, and she and D.W. shared D.W.'s bed. When Josephine was showering or sleeping, defendant would enter D.W.'s room. On more than 10 occasions, defendant got on the edge of the bed behind S.C. and put his hands on her breasts, sometimes under her pajama top and sometimes over it. In addition, each time he got into the bed, defendant would lie down behind S.C. and place his penis area in contact with her bottom. S.C. testified that she usually tried to pretend that she was sleeping, thinking that defendant would leave. A couple of times, S.C. tried to pull herself away or push defendant away. S.C. did not say anything to defendant when he touched her. S.C. did not, when it happened, tell an adult about defendant touching her, because she was scared that no one would believe her. She did discuss it with D.W. S.C. testified that she continued to go to Josephine's house, despite defendant's behavior, so that she could protect D.W. S.C. estimated that she slept at

_____

[3]The record reflects that defense counsel wanted the indictment read so as to inform the jury that, to convict defendant, the evidence would have to show beyond a reasonable doubt that defendant touched S.C. for the purpose of sexual gratification.

Josephine's "whenever [D.W.] was there" and that defendant would touch her breasts and put his penis near her bottom "most every time."

¶ 12    S.C. testified that there were also a "couple" of times that she came home from school and defendant was waiting in her driveway. S.C. testified that she was still age 12 at the time, but, at other points in the record, it appears that the after-school incidents occurred in the fall of 2007, when S.C. was over age 13. S.C. testified that she was the first person to return home at the end of a school day; her parents were at work, and Errol either would be on the bus on his way home or still at school. S.C. testified that she would go inside and into her room, and defendant would usually follow her. On one occasion, S.C. returned home and was already inside the house when defendant arrived and kept knocking on the door, calling her name and her phone, saying "I know you're in there" and "open the door." S.C. did not open the door, but she ran from her room into the bathroom and closed the door so that no one could see her. S.C. testified that defendant likely called Josephine, because Josephine telephoned S.C.'s mother and her mother then telephoned to yell at her, telling S.C. to open the door and to stop acting like a "brat." When Errol arrived home, he opened the door and defendant entered the house. Defendant came to S.C.'s room and sat next to her. When Errol passed by the room, defendant left and Errol made defendant a compact disc (CD). Defendant returned to S.C.'s room. He sat next to her on the bed and tried hugging her and kissing her on the cheek. Errol was present and, according to S.C., Errol thought that defendant was just trying to wrestle "or something." S.C. pushed defendant away, and the CD cracked. Defendant "got mad and they took it as just me being a brat again." Defendant left.

¶ 13    In October 2007, as guests were beginning to leave a family dinner at S.C.'s house, S.C. went to the basement to iron clothes. Defendant went to the basement to say goodbye. He came up behind S.C., pushed his penis against her bottom, and wrapped his arms around her stomach. Defendant was in that position for approximately 10 seconds. She agreed that she originally told the police that this incident occurred on November 15, 2007.

¶ 14    Grace saw something happen between S.C. and defendant in the basement, and she asked S.C. about it. On cross-examination, S.C. testified that Grace did not like the way defendant was hugging S.C. and had asked whether defendant had done anything other than hug her; S.C. replied that the only thing that occurred was hugging. She did not immediately tell Grace what defendant had done, because she was scared that she would not be believed. On more than one occasion, Grace asked S.C. about defendant going to the basement, but S.C. kept telling her that nothing happened. Grace stopped asking for awhile, but, on Thanksgiving Day in 2007, S.C. raised the subject with Grace and told her that defendant had actually grabbed her breasts. She did not, however, say anything about defendant pressing his private parts against her. Grace fell on her knees, was crying and trying to assure S.C. (who was also crying) that everything would be all right, and went to the bathroom to throw up. A few days later, S.C., D.W., Grace, and Josephine discussed defendant's conduct.

¶ 15    On December 3, 2007, S.C. complained to the police. In a written statement, S.C. did not mention that, when she slept with D.W. at Josephine's house, defendant got into the bed and pressed his penis to her bottom. Further, she agreed that in her written and oral statements to police she referred to defendant's "crotch area" and her own "back," as opposed to

defendant's "penis" and her "butt," and, further, that she described defendant's contact as "hugging." S.C. testified that, while she told the truth in her written statement, she did not provide every detail of every touching. S.C. agreed that she spoke with Detective Sabas Mercado on December 13, 2007, and she told him that she had known defendant for more than six years, had a great relationship with him, and considered him to be a brother. S.C. told Mercado that, on about 18 occasions when defendant climbed into bed with her, his crotch region made contact with her back and "butt" area. She agreed that, when defendant thrust his front into her back, she never felt his penis, but she clarified that, in her mind, his "crotch area" is his "penis area" and, by not feeling his penis, she meant that the area, when pressed against her, felt soft, not hard.

¶ 16    According to S.C., no one told her what to say or to make anything up to get defendant in trouble, nor was her testimony the result of her being mad at defendant for anything. She had been told only to tell the truth.

¶ 17    Errol testified that, on one trip to Silver Lake (the specific date of which he could not recall), he, defendant, S.C., and D.W. were swimming in the lake. He described the lake as having murky water and gradually reaching around 15 feet in depth. Errol testified that he watched defendant playing with S.C. in water that was approximately six or seven feet deep (he estimated that S.C. was just over five feet tall). It looked like they were "horsing around," *i.e.*, playing and dunking, with defendant grabbing S.C. and throwing her under water and S.C. coming back to the surface. Errol could not see whether defendant's hands made contact with S.C.'s body. According to Errol, after some time, S.C.'s facial expressions reflected irritation, and she got out of the water and sat by herself on a picnic bench. Errol saw defendant and S.C. have a conversation after she left the water.

¶ 18    Errol further recalled one occasion where he came home from school and defendant was present. Defendant asked Errol to burn him a CD. While Errol burned the CD, defendant walked around the living room, but Errol was focused on the CD and did not know where defendant was at all times. At some point, defendant went to talk to S.C. and they got into a "little altercation," breaking the CD. Defendant yelled at S.C., asking why she broke the CD. Errol was walking in the hall when he saw defendant and S.C. in her room and the CD on the floor in the hallway.

¶ 19    D.W., age 13, testified that she was born on April 30, 1997. She got along "pretty well" with defendant while he dated Josephine. Sometimes they went on vacation together, and he watched her after school while Josephine worked. Defendant and D.W. would watch television together, and he would help her with her homework. Defendant would sometimes buy D.W. food, clothes, and "stuff." Defendant did not yell at D.W. if she broke Josephine's rules; at night, before bed, D.W. would give defendant a hug, face-to-face. At some point, those hugs changed, and defendant would come up from behind D.W., put his arms around her shoulders, and "go down" to her stomach such that his arms and hands would touch her breasts. This happened "like 20" times. This occurred when Josephine was sleeping or in a different room. D.W. was not comfortable with the way defendant hugged her. Defendant told D.W., "this is our secret," and, when it started, she did not tell anyone.

¶ 20    D.W. testified that she and S.C. were pretty close while growing up, and they would hang

-6-

out and play. D.W. recalled swimming with S.C., Errol, and defendant at Silver Lake. S.C. was not in the water the entire time they were swimming; rather, she got out of the water and sat down. Later, D.W. asked S.C. why she got out of the water, and S.C. was mad and answered only "cuz."

¶ 21　During most weekends that D.W. spent with Josephine (as opposed to with her father), S.C. spent the weekend with D.W. and stayed in her bed. Defendant did not always stay in his room; on more than one occasion, he came into D.W.'s room and climbed into the bed between the girls. D.W. could not see anything in the room, because it was dark.

¶ 22　D.W. agreed that she met with defendant's attorney. The assistant State's Attorney asked whether she told defense counsel that "nothing ever happened." She stated, "no." On cross-examination, D.W. agreed that she met with defense counsel and he recorded their conversation. However, she clarified that, while she told defense counsel that she did *not* tell police that defendant rubbed her breasts in an upward motion, she *did* tell police and her mother that defendant rubbed her breasts in a downward motion. Ultimately, the tape recording was played to the jury. Afterward, the State asked D.W. if defendant touched her breasts in a downward motion, and she replied in the affirmative. D.W. recalled meeting with Department of Children and Family Services (DCFS) investigator Robert Schnabel at her school, but she did not recall telling him that defendant did not touch her in a bad way.

¶ 23　Grace testified that she is S.C.'s mother and D.W.'s grandmother. When Josephine was dating defendant, he and Grace would interact on family events and trips. Grace felt that defendant was a nice person, "he was like a son," and she trusted him. Grace testified that, on October 26, 2007, her son's girlfriend came to visit from Arizona and the family had a dinner. Afterward, Grace began cleaning the kitchen and S.C. went to the basement to iron. There are approximately 12 steps leading into the basement. She heard Josephine tell defendant that it was time to leave, and defendant walked past Grace to go to the basement. Describing herself as "a nosy mom," Grace testified that she wondered why, when S.C. was the only person in the basement, defendant was going there. Grace "peeked" down the stairs and saw defendant "up in the back" of S.C., and he put his arms around her and pressed his private part, specifically his penis, against her "tush." Grace explained that she was stooping down at the top of the stairs and that, when she stood up, Josephine saw the expression on her face and asked what was wrong. Grace said nothing. A few days later, Grace asked S.C. whether that was the way defendant hugs her; S.C. did not answer, but her face turned red. A few days later, Grace again told S.C. that she needed to know if that was the way that defendant hugs her; S.C. replied, "yes, mommy, I keep on telling him," and the conversation ended. Grace estimated that she confronted S.C. approximately three times about what she had seen.

¶ 24　For a few days around Thanksgiving 2007, Grace went to stay at her employers' home to care for their dogs while they were out of town; S.C. went with her. On the way there, S.C. looked sad, and Grace said to her that she wished S.C. would tell her what was wrong; S.C. replied "Mommy, you wouldn't want to know," and put on her headphones. On Thanksgiving morning, Grace found S.C. in bed crying and trembling. She asked S.C. what was wrong, and S.C. told her about how defendant had touched her. S.C. continued to shake and cry, and Grace ran to the bathroom and vomited.

¶ 25    Grace did not immediately go to the police, because she wanted to find out more. For example, she took S.C. to the doctor to confirm that no sexual intercourse was involved. Grace, S.C., and D.W. then had a meeting with Josephine (who was, at the time, pregnant with defendant's child) at Grace's house. Grace testified that she did not ever tell or suggest to S.C. or D.W. what they should say about what happened between them and defendant. While Josephine was at Grace's house, defendant called Josephine's cell phone. Grace answered the call and recognized defendant's voice. She recalled as follows:

"I said, you child molester. I said, you were touching these girls. *** He shout[ed] back and he say, Grace, I have to tell you something. These girls are playing with each other. And I tell him, I said, you f***ing pervert[.] *** I will call the police."

According to Grace, Josephine has since stopped talking to her.

¶ 26    On November 30, 2007, Grace went with her husband to the police. She agreed that, in her handwritten statement to the police, she characterized defendant's arms around S.C. as an inappropriate "hug," and she did not describe therein the thrusting of defendant's penis against S.C.'s bottom. Grace later met with Mercado alone and, on other occasions, as requested, she brought S.C. to a children's advocacy center to be interviewed. She was not in the room while S.C. was questioned. Grace never told S.C. what to say. Grace agreed that the image of the way defendant had grabbed S.C. continues to haunt her.

¶ 27    Mercado testified that he met with Grace on December 3, 2007. On December 13, 2007, he met with S.C. at the children's advocacy center. He and another detective interviewed S.C. for approximately 1½ hours, and then they left her alone to put into writing what she told them. Similarly, they separately met with D.W. on December 13, 2007, but, because she was only 10 years old, they did not ask her to put her comments in writing at the end of the interview. A warrant for defendant's arrest issued on February 14, 2008. Mercado agreed with defense counsel that, on December 14, 2007, defense counsel contacted Mercado and Mercado told him that he was reviewing the case, might seek a warrant, and would contact counsel if a warrant were obtained. Mercado agreed that the warrant was not issued until two months later and that he did not contact counsel to tell him that there was a warrant.

¶ 28    Over defendant's objection, Officer Timothy Fitch testified that he works in the warrants division of the Lake County sheriff's office. He arrests people who are wanted for failing to appear on warrants. On September 25, 2008, Fitch and his partner, Deputy Van Dien, drove in an unmarked minivan to 1295 Kathleen Court in Antioch. They had received a tip that defendant, who was wanted on a criminal sexual abuse warrant, would be arriving at that location in a gray Grand Am vehicle after 5 p.m. Fitch and Van Dien were wearing bulletproof vests, with the word "Sheriff" written on the front and back, and star badges. They were equipped with their normal equipment, including flashlights, pepper spray, Tasers, guns, and ammunition.

¶ 29    Ultimately, a gray Grand Am pulled into the garage at 1295 Kathleen Court. When the officers drove by, a woman was sitting on the front porch holding an infant. Fitch and Van Dien, using binoculars, subsequently looked in the backyard and saw a man whose appearance matched the photograph they had of defendant. They pulled their vehicle around to the front of the house and saw defendant walking toward a lawn mower between two

homes. They approached; Fitch told defendant that they were with the sheriff's office and that they had a warrant for defendant's arrest. Fitch did not say to defendant what the warrant was for or what defendant was charged with. Defendant stated that he was not Jesus Perez and that his name was Joe Rodriguez. Fitch asked for identification, and defendant had none. Defendant stated that he lived at the house he was in front of, which was *not* the house at 1295 Kathleen Court. Fitch asked if they could go inside the house to get some identification, and defendant agreed; however, as they walked up to the front door, defendant pushed Van Dien in the chest and ran. Fitch and Van Dien chased defendant, yelling "stop" and "police." After a chase, Fitch yelled to defendant that, if he did not stop, he would be tased. Defendant did not stop, and Fitch fired the Taser. Only one probe hit defendant and so, while defendant was stunned, he did not stop running. Defendant tried to hop over a fence and fell; at that point, Fitch caught up with defendant and sprayed him with pepper spray. Fitch told defendant to get on the ground, but defendant did not listen to verbal commands and tried to walk away. Fitch sprayed defendant a second time. Fitch grabbed defendant's arms and placed him on the ground on his stomach. Defendant was then handcuffed and walked to the squad car.

¶ 30    After defendant was in custody, Fitch returned to 1295 Kathleen Court and spoke with Josephine, who was there with Xavier, her infant son with defendant. Josephine confirmed defendant's identity and that he lived at that address. The court denied defendant's motion for a mistrial due to the prejudicial nature of Fitch's testimony. The State rested. The court denied defendant's motion for a directed verdict.

¶ 31    In defendant's case, Robert Schnabel testified that he works for DCFS and that, on December 6, 2007, he met with D.W. at her school and in the presence of a school administrator. At that time, D.W. volunteered to Schnabel that defendant was like her father and that there had been some touching but she did not feel that it was bad. D.W. did not state that defendant had touched her breasts; Schnabel did not ask D.W. whether defendant had touched her breasts. Schnabel clarified that he was not there to interview D.W.; rather, the purpose of the visit was to meet with D.W., ensure that she knew the identity of the alleged perpetrator, and ensure that there would be no contact between D.W. and the perpetrator during the course of the DCFS and police investigation. His visit with D.W. lasted approximately three minutes.

¶ 32    Mercado testified in defendant's case that Grace told him she could not see defendant's hands when he was pressed up behind S.C. in the basement and that she used the word "hug." He agreed, however, that Grace was very detailed in her description of defendant wrapping his arms around S.C. and thrusting his crotch into S.C.'s backside. Mercado agreed that neither S.C. nor D.W. ever used the word "penis" in their interviews. S.C. told Mercado that, when defendant's front was pressed against her back, she could feel nothing unusual from the waist down. He clarified that the question about feeling anything unusual from the waist down related to whether the girls felt a hard penis; they did not.

¶ 33    Defendant's two cousins, Jo Anne Perez and Joaquin Coronado, and defendant's sister, Dalia Martinez, all testified that they had witnessed defendant's interactions with S.C. and D.W. at various family outings. The children were playful and affectionate with defendant, and there were no signs of trouble or hostility.

¶ 34   Josephine testified in defendant's case that she lives in Gurnee with D.W. and Xavier. On about 15 to 20 occasions, Josephine discussed with D.W. the alleged contact between defendant and D.W. On all occasions, Josephine told D.W. that she wanted only to determine the truth. Each time, D.W. denied that defendant touched her improperly and denied that there was any contact with her breasts. When Josephine asked D.W. why D.W. had told other people differently, D.W. said she did not know or would deny having said such things to others. According to Josephine, she and defendant resided together with D.W. for nine years prior to these alleged events. D.W. and defendant had a good relationship, and they would show physical affection, like kisses and hugs good night. D.W. would put her arms around defendant and kiss him on the forehead. There was never an instance of controversy between defendant and D.W., D.W. never complained about defendant's conduct toward her, and D.W. never showed reluctance to be in defendant's presence or to show or exchange affection with him.

¶ 35   Similarly, as S.C. and D.W. were raised close to each other, the relationship between S.C. and defendant also went back nine years. Josephine saw S.C. exchange affection with defendant; for example, they would exchange platonic hugs and kisses. She never saw S.C. demonstrate any hostility toward or reluctance to be near defendant, and S.C. never expressed any reluctance to spend the night at Josephine's house. In Josephine's house, to get to D.W.'s bedroom from Josephine's bedroom, one would have to walk through the living room, where Errol slept on the couch, then to the back of the house. Josephine agreed that it was her habit to shower in the evening before bed, but she estimated that her showers lasted only 10 minutes or less. Josephine testified that she would have noticed if defendant had left their bed for a substantial period only to return later and that this had not, to her knowledge, ever occurred. Because of this case, Josephine had not spoken to Grace in more than one year, and she does not see S.C.

¶ 36   In closing argument, the assistant State's Attorney discussed all of the incidents testified to by S.C. (Wisconsin, in bed, after school, by ironing board). Then, he stated:

"Before I move on to [D.W.'s] testimony, I want to be crystal clear as to what the defendant is standing trial for and what you all are going to have to deliberate and find him guilty of. You're not going to be asked to return a verdict on what happened at Silver Lake and what happened after [S.C.] turned 13. So the ironing board incident and coming over after school. In the bed when she was 12 and he was 29 at [Josephine's] house and he was touching her breasts over and under the clothes and he was rubbing his private parts on her butt. That's what you're going to deliberate on. You're not going to deliberate to a verdict on the other stuff.

When I talk about [D.W.], you're also not going to deliberate on a verdict and find whether or not [D.W.] was touched about the breasts. But it's important. That's why we put it on and you can consider that testimony, but you don't deliberate on a verdict. You're going to be given instructions as to what you can consider about that other conduct. But I want to be clear, the verdict you're going to deliberate is when she's 12 in that bed, breasts and rubbing of the penis on the butt."

Later in his argument, the assistant State's Attorney reiterated that, although S.C.'s

December 2007 police statement encompassed more, the jury was to deliberate on the conduct that occurred in the bed when she was age 12.

¶ 37    In his closing argument, defense counsel informed the jury that it could not consider the basement incident, which was outside the time frame of the acts charged, and the Silver Lake incident, which happened in Wisconsin, not Illinois.

¶ 38    In rebuttal closing, the State asked the jury to "go back and deliberate on the 29 year old laying in bed with these girls and touching [S.C.'s] breast and come back and tell him it's not okay."

¶ 39    At the jury instructions conference, the parties disagreed about what instruction regarding the other-crimes evidence should be offered. Defendant argued that, because the State introduced evidence of bad acts *other* than sexual conduct (specifically, the circumstances surrounding his arrest and flight), the jury should receive an instruction that it could consider those acts only for limited purposes. The State argued that, because the jury could consider for *any* purpose the other-crimes evidence regarding sexual conduct, a hybrid instruction would be proper. Specifically, the State argued, a hybrid instruction would inform the jury that it could consider for any purpose the evidence regarding other sexual acts, but could consider for only limited purposes the evidence regarding defendant's arrest. The court rejected the State's request for a hybrid instruction. Thus, the jury was instructed:

> "Evidence has been received that the defendant has been involved in conduct other than those charged in the indictment. The evidence has been received on the issues of the defendant's identification, presence, intent, motive, design and knowledge, and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of identification, presence, intent, motive, design and knowledge."

¶ 40    The jury was also instructed that the comments made by attorneys in closing constitute argument, not evidence. Finally, the jury was given four verdict forms. The first two related to the jury finding defendant guilty or not guilty of "fondl[ing] the breasts of [S.C.]" The second two related to the jury finding defendant guilty or not guilty of "push[ing] his penis against the buttocks of [S.C.]" The jury found defendant guilty of both charges. The court denied defendant's posttrial motion and sentenced defendant to six years' imprisonment. Defendant appeals.

¶ 41                                    II. ANALYSIS
¶ 42                        A. Quantity of Other-Crimes Evidence
¶ 43    Defendant argues first that reversible error occurred where the majority of the State's case was comprised of other-crimes evidence. He notes that the issue at trial was whether he fondled S.C.'s breasts and pushed his penis against her bottom during weekend sleepovers in the summer of 2006. Defendant asserts that the many weaknesses of S.C.'s claims regarding the two charges were camouflaged by the extensive evidence of other sexual conduct (*i.e.*, committed against S.C. in Wisconsin, after S.C. turned age 13, and against D.W.). Defendant argues that the aggregate prejudicial effect outweighed the evidence's probative value, rendering the trial unfair.

-11-

¶ 44    In his appellate briefs, defendant highlights many alleged weaknesses in the evidence pertaining to both the charged and uncharged conduct.[4] However, defendant's arguments regarding the credibility of the evidence are somewhat misplaced here. While defendant asserts that the quality of the other-crimes evidence exceeded that of the charges, his main allegation is that the other-crimes evidence unfairly prejudiced him because its stronger credibility, coupled with its *quantity*, distracted the jury from the weak evidence regarding the charges. Thus, defendant asserts, had it considered in isolation the evidence pertaining to the charges, the jury might have acquitted him of those charges.

¶ 45    Other-crimes evidence is unquestionably prejudicial to a defendant. Generally, the risk associated with the admission of other-crimes evidence is that it might prove "too much," rendering a jury inclined to convict the defendant simply because it believes that he or she is a bad person deserving of punishment. *Donoho*, 204 Ill. 2d at 170. Under certain circumstances, however, the probative value of other-crimes evidence is considered to outweigh its prejudicial effect, rendering it admissible. For example, under the common law, other-crimes evidence may be admissible for limited purposes, such as establishing motive, identity, presence, *modus operandi*, knowledge, intent, common design, or absence of mistake. *Id.* Regardless of probative value, however, under the common law the introduction of other-crimes evidence is *not* permitted for the purpose of establishing the defendant's propensity to commit crimes. *Id.*

¶ 46    In contrast, section 115-7.3 of the Code permits evidence of a defendant's prior sexual activity with a child complainant to be admitted for *any purpose*, including the defendant's propensity to commit sex offenses. See *id.* at 176; *Cardamone*, 381 Ill. App. 3d at 491. Like the common law, however, section 115-7.3 permits other-crimes evidence only if: (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. *Donoho*, 204 Ill. 2d at 177-78. Section 115-7.3 further provides that, in weighing probative value against prejudicial effect, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2008).

¶ 47    Our supreme court has urged trial courts "to be cautious in considering the admissibility

---

[4]For example, as to the charges: (1) S.C.'s failure to mention in her December 13, 2007, police report that defendant pressed his penis against her bottom; (2) that D.W. failed to corroborate S.C.'s claim that, when defendant was in bed with them, S.C. took actions to push him away or to pull herself away from him; (3) that Errol did not testify that he ever noticed defendant entering or leaving D.W.'s room, even though he slept on the couch in the living room and defendant would have had to walk past Errol to get in or out of D.W.'s room; (4) that S.C. did not initially report the abuse and continued to sleep at Josephine's with no expression of reluctance; and (5) when S.C. did report the abuse, in November 2007 (although it happened in the summer of 2006), it was only after repeated questioning by Grace. Defendant notes many alleged weaknesses in the other-crimes evidence, too, but notes that those incidents, unlike the charges, at least had some form of corroboration (*e.g.*, Errol and D.W. saw S.C. get out of the water after playing with defendant in the water, Errol agreed that defendant was at their home after school and that defendant and S.C. had a disagreement, and Grace saw something occur in the basement, by the ironing board).

of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186. When weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury. See *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) (other-crimes evidence must not become a focal point of the trial, and the detail and repetition admitted must be narrow so as to avoid the danger of a trial within a trial). A trial court's decision to admit other-crimes evidence will not be reversed unless the court abused its discretion. *Donoho*, 204 Ill. 2d at 182. A trial court abuses its discretion if the court's determination is unreasonable, arbitrary, or fanciful, or if no reasonable person would adopt the court's view. *Id.*

¶ 48    Defendant concedes that the other-crimes evidence here satisfied section 115-7.3's requirements regarding relevance and probative value (*i.e.*, he concedes temporal proximity and similarity to the charged offenses), but he argues instead that the volume of evidence created substantial prejudice that outweighed probative value. In *Cardamone*, this court recognized that there might be times when the sheer volume of other-crimes evidence renders it unduly prejudicial. *Cardamone*, 381 Ill. App. 3d at 496-97 (finding other-crimes evidence unduly prejudicial where the State, in its prosecution of a gymnastics coach for sexual abuse, introduced as many as 257 incidents of uncharged conduct against 7 alleged victims). Defendant argues that the quantity of other-crimes evidence admitted here presents a "textbook example of a trial within a trial" and constitutes reversible error. We disagree.

¶ 49    We note first that *Cardamone* did not purport to hold that anytime the evidence of other crimes outnumbers that of the charged incidents, the prejudicial effect renders the other-crimes evidence inadmissible. Indeed, *Cardamone* recognized that section 115-7.3 permits other-crimes evidence to be introduced for substantive purposes and that determining whether the nature and quantity of the evidence is excessive is left to the trial court's discretion. *Id.* at 489, 497 (noting that "[c]learly, *some* of the evidence was admissible and it is difficult to determine precisely where to draw the line" (emphasis added)). Simply put, *Cardamone* was an extreme case. This court has recognized that *Cardamone*'s application of section 115-7.3 to the circumstances therein likely reflects the "outer bounds" of the rule, leaving more "subtle inner striations" to determining when the volume of other-crimes evidence admitted under section 115-7.3 becomes unduly prejudicial. *People v. Walston*, 386 Ill. App. 3d 598, 619 (2008). Further, *Walston* noted that, in general, the danger of unfair prejudice in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished by the very fact that section 115-7.3 upended the long-standing rule that other-crimes evidence to establish propensity is *per se* unfairly prejudicial–instead, introduction for propensity is actually proper. *Id.* at 619-20. Thus, while undue prejudice *can* arise in a section 115-7.3 case, "the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest, especially when combined with the highly deferential abuse-of-discretion standard that governs review of such trial court decisions." *Id.* at 621. Moreover, while the court must carefully consider the quantity of other-crimes evidence and be mindful of probative value and undue prejudice, it may consider that any undue prejudice of "more thorough other-crimes evidence" admitted

under section 115-7.3 will be "less" unduly prejudicial than in a common-law other-crimes case. *Id.* at 622.

¶ 50      Given the foregoing, we cannot say that, here, the trial court abused its discretion. Defendant was charged with two incidents; the other-crimes incidents may be grouped into four categories: (1) defendant touching S.C. at Silver Lake, Wisconsin; (2) defendant touching S.C. at her house after school; (3) defendant touching S.C. by the ironing board, in the basement; and (4) the conduct testified to by D.W. While the quantity of other-crimes evidence did exceed that of the charged conduct, it certainly did not rise to the extreme volume reflected in *Cardamone* and it otherwise reflected relevant propensity evidence under section 115-7.3. Specifically, and as the trial court noted, context is relevant and, without context, limiting a complainant's testimony might make the charged incidents appear isolated and unfairly strain the credibility of the complainant's testimony concerning the charged offenses. See, *e.g.*, *People v. Tannahill*, 152 Ill. App. 3d 882, 887 (1987). Here, without evidence regarding the Silver Lake touching, the jury would have heard that defendant crawled into bed with her, touched her breasts, and pushed his penis against her without any context for how that behavior began, *i.e.*, "horseplay" in the water that escalated to touching S.C.'s breasts over her swimsuit. As such, and given the previously positive relationship between S.C. and defendant, the bedroom events would have appeared to come out of nowhere, straining S.C.'s credibility. Similarly, without evidence of the incident by the ironing board, the jury would have lacked information regarding how S.C. came to inform her mother about defendant's conduct and how charges came to be pursued. Without evidence of defendant's presence and touching at S.C.'s house after school in the fall of 2007, the jury would not have understood that defendant's behavior was not isolated to the two foregoing incidents, which were separated by more than one year (the Silver Lake touching in the summer of 2006 and, in October 2007, the touching by the ironing board). Rather, evidence regarding defendant's actions at S.C.'s house after school filled in that time gap to establish that the pattern of conduct continued in the interim.

¶ 51      We note that the evidence presented by D.W. is slightly more complicated in that her testimony claimed 20 incidents of touching, and, as defendant notes, his motion to sever the trials related to S.C. and D.W. was granted *because* of the prejudicial nature of such testimony. The tension that section 115-7.3 has arguably placed on the joinder statute (725 ILCS 5/114-8(a) (West 2008)) has been noted by this court. See *Walston*, 386 Ill. App. 3d at 622-23 (considering whether misjoinder was harmless error where, even if trials had been severed, section 115-7.3 permits "expansive propensity evidence" to be introduced even where crimes cannot, under the Illinois joinder scheme, be tried together). Nevertheless, this court in *Walston* emphasized that the issue of joinder must be considered "separately, and completely," regardless of the fact that section 115-7.3 might, in effect, render a misjoinder harmless. *Id.* at 623. Thus, the two remain separate inquiries and, even where, as here, the trials on charges related to separate complaining witnesses are severed, one complainant's testimony may, if it meets section 115-7.3's requirements and the court, in its broad discretion, finds the evidence more probative than prejudicial, be introduced in the other trial via section 115-7.3.

¶ 52      Turning to the substance of D.W.'s testimony, we cannot find error in the trial court's

decision. Again, defendant does not dispute that D.W.'s testimony was relevant and probative. We agree with the trial court that the prejudicial effect of the evidence did not outweigh its probative value. D.W. did not testify (unlike the witnesses in *Cardamone*) at length about each alleged instance of contact; rather, she summarily testified that, on approximately 20 occasions, defendant wrapped his arms around her from behind and touched her breasts. Specifically, on direct examination, through approximately 15 to 20 questions, the State established with D.W. that: (1) defendant began hugging her from behind; (2) defendant put his arms around her shoulders and moved his arms and hands downward; (3) defendant's arms and hands touched D.W.'s breasts; (4) defendant touched her in this manner approximately 20 times; (5) D.W. was not comfortable with this touching; and (6) defendant never touched any other private area on D.W.'s body. Thus, the testimony was not unduly inflammatory or excessive.

¶ 53 We also note that, while defendant suggests that the surrounding circumstances of some of the other-crimes conduct, such as defendant throwing S.C. into water where she could not stand, or trying to get her to open the door when she was home alone, were far more egregious than those surrounding the charges, he does not, in fact, argue that the *nature* of this other-crimes evidence (as opposed to its quality or quantity), rendered it inadmissible. See *id.* at 621 n.9 (regardless of quantity, the nature of propensity evidence, such as its severity, closeness in time, and whether it can be proved, remains relevant to considering its admissibility under section 115-7.3). None of the other-crimes evidence was particularly more heinous than the charged conduct such that, regardless of quantity, it might be unduly prejudicial. For example, while defendant's pounding on the door to enter S.C.'s house might be viewed as terrifying to a child, the jury could also reasonably find that defendant's entry into a dark bedroom and into D.W.'s bed during S.C.'s vulnerable state of sleep was equally, if not more, terrifying. Further, this is not a case where the alleged uncharged conduct was more extreme or heinous (*e.g.*, vaginal penetration) than the charged conduct (touching of breasts, sometimes over clothes). Here, while the locations and circumstances of the alleged touches varied, the other-crimes evidence reflected, consistent with the charges, the touching of breasts over clothing or the pressing of defendant's clothed pelvic region against S.C.'s bottom.

¶ 54 In sum, we reject defendant's argument that the trial court committed reversible error by admitting under section 115-7.3 more evidence of uncharged crimes than evidence related to the charges. We note that, in *Cardamone*, the risk of juror confusion was heightened by fact that the case was complex and involved over 100 witnesses. Here, there were significantly fewer witnesses, the issues were not complex, and the volume of other-crimes evidence, while greater than that pertaining to the charges, was not excessive. Given the contextual relevance of the other-crimes evidence, as well as the fact that the trial court clearly considered the relevant case law regarding admission of section 115-7.3 evidence, conducted a meaningful assessment of the probative value versus prejudicial effect of the evidence, and narrowed the scope of the evidence to avoid mini-trials by directing the State to select only three or four incidents to provide context for the charges, we conclude that there was no abuse of discretion.

¶ 55                          B. Limiting Instructions

¶ 56        Defendant next argues that, cumulatively, the trial court's: (1) failure to give limiting instructions when witnesses testified to uncharged conduct; and (2) use of jury instructions and verdict forms that did not distinguish between uncharged and charged conduct rendered the jury verdict unreliable because the convictions might have been based on the uncharged conduct. Defendant notes that at no time during the trial did the court distinguish for the jury evidence regarding the charged conduct versus the uncharged conduct. Alternatively, defendant argues that his trial counsel rendered ineffective assistance where he failed to request the foregoing or to otherwise bring the errors to the court's attention.

¶ 57        Defendant concedes that he did not object below to the trial court's alleged errors and that, therefore, both issues are forfeited. See *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (both an objection at trial and raising the issue in a posttrial motion are necessary to preserve the issue for appellate review). Defendant asks that we review the issues for plain error under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). Plain-error analysis permits a reviewing court to consider and grant relief on a forfeited claim where: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *Herron*, 215 Ill. 2d at 178. However, the analysis first requires that there be an error, that the error be plain, and that the error affect substantial rights. *Id.* at 184-85; *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). As there was no error here, defendant's claims remain forfeited.

¶ 58        We consider first the lack of limiting instructions during the course of trial. Our supreme court has held that, even when other-crimes evidence is being introduced under the common law and *only* for limited purposes, a court's failure to provide limiting instructions when the evidence is presented "does not mandate reversal." *People v. Heard*, 187 Ill. 2d 36, 61 (1999) (finding that the defendant received a fair trial when proper admonitions were given only after closing argument). Providing limiting instructions contemporaneous to the introduction of common-law other-crimes evidence is the "better practice," but it is not required. *Id.* at 60-61; see also *People v. Butler*, 377 Ill. App. 3d 1050, 1067 (2007) (limiting instructions when the other-crimes evidence is presented to jury merely "suggested"). Thus, if limiting instructions are not *required* even where other-crimes evidence is admissible only for limited purposes, they are certainly not required where, as here, the evidence is admissible under section 115-7.3 for any purpose, *i.e.*, *without limitation*.

¶ 59        Interestingly, and despite the court's initial ruling that the evidence was admissible under section 115-7.3 for any purpose, the court ultimately *did* instruct the jury, before its deliberations, that all of the other-crimes evidence (without distinction between the sexual conduct and arrest/flight evidence) could be considered only for limited purposes. Thus, although a limiting instruction regarding the section 115-7.3 evidence was not required, defendant nevertheless benefitted from a limiting instruction on that evidence. Thus, for three reasons, there was no error in the court's failure to provide limiting instructions contemporaneous to the introduction of the evidence: first, because, under section 115-7.3, the evidence was admissible without limitation; second, because, even if it were admissible for limited purposes, such admonitions are merely suggested, not required; and, third, because a limiting instruction was ultimately presented, even where it was not required.

Therefore, there was no plain error and defendant's argument regarding the limiting instructions remains forfeited.

¶ 60     Next, defendant notes that the jury was not informed at any point during the trial which alleged acts comprised the charges. He points out that the jury instructions and verdict forms informed the jury only generally that it had to find that defendant touched S.C.'s breasts and/or pressed his penis against her bottom, but *not* that it had to find that defendant committed those acts in bed with S.C. in the summer of 2006. Defendant argues that, without instructions or verdict forms that differentiated between the charged and uncharged incidents, there is a strong likelihood that the jury convicted defendant based upon an uncharged act. Finally, defendant argues that the assistant State's Attorney's distinction, in closing argument, between the charged and uncharged conduct did not cure the error, because the jury was instructed by the court that closing arguments are not evidence. We disagree.

¶ 61     We conclude, looking at the record in its entirety, that the jury was sufficiently apprised of the distinction between the charged and the uncharged conduct and that, therefore, there was no plain error. The following information was provided to the jury before and at the beginning of trial: (1) in *voir dire*, the potential jurors were informed that defendant was charged with aggravated criminal sexual abuse that occurred on or before June 1, 2006, and January 20, 2007; (2) in opening statements, defense counsel informed the jury that this case involved only S.C. and *not* D.W.; and (3) the jury heard evidence that S.C. was born on January 20, 1994, which made her 13 years old on January 20, 2007. Thus, the jury knew before it heard the other-crimes evidence that any acts that occurred *after* January 20, 2007 (such as the incidents in the basement and at S.C.'s house after school), did *not* form the basis of the charges.

¶ 62     The jury heard the following information at the close of trial: (1) in closing argument, the assistant State's Attorney explicitly informed the jury that the charged acts were *only* those related to the bedroom in the summer of 2006 and *not* any in Wisconsin, in the basement, after school, or testified to by D.W.; (2) the defense attorney, in closing argument, repeated that the jury was not to consider the basement or Wisconsin incidents as charged acts; (3) the jury was *instructed* that, to convict defendant of the offense of aggravated criminal sexual abuse, S.C. had to be *under 13 years of age* when the act was committed; and (4) the jury was *instructed* that, although it heard evidence that defendant was involved in acts other than those charged in the indictment, it should determine whether that conduct occurred and, if so, the weight to give that evidence on the issues of identification, presence, intent, motive, design, and knowledge. As such, after hearing from the attorneys that the charges involved *only* the touches in bed, the jury was again informed that, as to any other conduct, it could be considered only for limited purposes.

¶ 63     Defendant was entitled to a fair, but not a perfect, trial. *Herron*, 215 Ill. 2d at 177. We agree that better precision in the instructions and verdict forms would have been preferable. We further believe that it is incumbent on a trial court, when considering admission of other-crimes evidence under section 115-7.3 and assessing whether prejudicial effect outweighs probative value, to assess whether a failure to specifically differentiate between charged and uncharged conduct would, under the facts of the particular case, render admission unduly prejudicial. We suspect that, in most cases, the better practice will be to inform the jury of

the charged versus uncharged conduct as that evidence is admitted. Nevertheless, we do *not* agree, given the foregoing facts and circumstances, that this verdict was rendered unreliable. We conclude that the jury was sufficiently apprised of the distinction between the charged and the uncharged conduct and that, therefore, there was no plain error.

¶ 64    Further, we note that, although the jury was told that closing arguments are only argument, not evidence, we do not agree with defendant's suggestion that the court's admonition completely eviscerated any *information* that the attorneys provided to the jury in closing. Specifically, nothing about the attorneys' comments in closing regarding the charges reflected their "spin" on evidence; rather, the attorneys were in *agreement* and were consistent in informing the jury about which conduct formed the basis of the charges. Finally, to the extent that defendant's argument that the absence of precise forms and instructions prejudiced him raises a cumulative-error argument, that argument fails where none of the separate claims amounts to reversible error. See *Cardamone*, 381 Ill. App. 3d at 510.

¶ 65    Finally, defendant's alternative argument, that defense counsel rendered ineffective assistance where he failed to request limiting instructions or specific jury instructions and verdict forms, also fails. When a defendant argues that counsel's performance was ineffective, he or she must show both that: (1) the attorney's performance fell below an objective standard of reasonableness (deficient-performance prong); and (2) there is a reasonable probability that, but for the attorney's deficient performance, the outcome of trial would have been different (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001). To succeed on an ineffective-assistance claim, both *Strickland* prongs must be satisfied. *Strickland*, 466 U.S. at 687; *People v. Williams*, 181 Ill. 2d 297, 320 (1998). There is a strong presumption that an attorney's performance falls within the wide range of reasonable professional assistance. Trial strategy cannot be a basis for finding counsel ineffective. See *People v. Smith*, 177 Ill. 2d 53, 92 (1997).

¶ 66    An attorney's decision to request a limiting instruction can be viewed as strategic. See, *e.g.*, *People v. Figueroa*, 341 Ill. App. 3d 665, 673 (2003). Defendant cannot establish that counsel performed deficiently at trial where: (1) given the motion *in limine* ruling, defendant was not entitled to any limiting instructions during trial (see, *e.g.*, *People v. Phipps*, 238 Ill. 2d 54, 64-65 (2010) (counsel is not required to offer baseless or losing arguments to avoid being found ineffective)); and (2) counsel *did* request a limiting instruction at the close of trial and was successful in that effort. Therefore, there was no deficient performance regarding the limiting instructions.

¶ 67    As to the remaining jury instructions and verdict forms, which did not distinguish between the charged and uncharged conduct, defendant cannot establish that counsel's decisions were not strategic. Indeed, counsel might have determined that, where his pretrial attempts to have the actual charges specified to the jury were unsuccessful, any further efforts in that regard would be fruitless. See *Phipps*, 238 Ill. 2d at 64-65. Moreover, counsel might have determined that defendant was sufficiently protected where counsel was able to obtain for defendant an unexpected and favorable ruling in that he received a limiting instruction for evidence that was previously ruled admissible without limitation. Finally, counsel might have strategically determined that additional efforts to distinguish between charged and

uncharged incidents would have further highlighted the entirety of the evidence and would not have served defendant's interest.

¶ 68 Effective assistance refers to competent, not perfect, representation, and "[t]he reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts." *People v. Calhoun*, 404 Ill. App. 3d 362, 383 (2010). Here, defendant's ineffective-assistance claim fails because he cannot establish that defense counsel performed in an objectively unreasonable manner.

¶ 69                                III. CONCLUSION

¶ 70 For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 71 Affirmed.

¶ 72 JUSTICE McLAREN, specially concurring:

¶ 73 I specially concur because I wish to address a point that I consider to be error. Defendant requested that the indictment be read to the jury. Allegedly, it was to emphasize the element of sexual gratification that was required for conviction. Defendant was not entitled to such a reading; however, I believe that, in the context of the procedural aspects of this case, reading the indictment would have ameliorated the problem that I believe constituted procedural error. The jury in this case was not told until closing argument what the charges were that it was to adjudicate. If opening statements and the trial are supposed to achieve anything, it is to advise the jury of the charges, present the evidence relative to those charges, and instruct or direct the jury, prior to closing arguments, on the issues and the proofs that are presented relative thereto. The majority disposition relates:

> "In opening statements, the State discussed the evidence the jury would hear but did not distinguish the acts that formed the basis of the charges from the other-crimes evidence. Similarly, defense counsel did not state what specific acts defendant was charged with committing; however, he did inform the jury that the trial and the evidence pertained only to S.C., not D.W." (Emphasis added.) *Supra* ¶ 8.

I consider it error to fail to apprise a jury of the charges against a defendant when it is anticipated that there will be presented, and ultimately is presented, other-crimes evidence. The jury ought to know what it is to focus on, what it will be charged with adjudicating, prior to closing arguments. If the cliché, "Tell 'em what you're going to tell 'em. Tell 'em. Tell 'em what you told 'em." (attributed to Paul Welrose White, June 6, 1902-July 9, 1955, CBS radio news director, beginning in 1930) has application, it should be here.

¶ 74 Nevertheless, I do not believe that prejudice arose. I do not believe that the outcome would have been different. I do not believe that the jury was sufficiently confused, distracted, or misinformed so as to call the verdicts into question.