2019 IL App (1st) 17-0324-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
November 19, 2019

No. 1-17-0324

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 13 CR 18794 |
| BERNARD DAVIS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Timothy Joseph Joyce, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in permitting the admission of limited other-crimes evidence of the defendant's one prior conviction of predatory criminal sexual assault of a child (725 ILCS 5/115-7.3 (West 2012)). The prosecutor's comments in rebuttal closing argument were invited by arguments made by defense counsel and were neither inflammatory nor substantially prejudicial to the defendant.

¶ 2    Following a jury trial in the circuit court of Cook county, the defendant, Bernard Davis, was found guilty of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2012)) and sentenced to natural life and 30 years' imprisonment to be served consecutively. On appeal, the defendant contends

that the trial court erred when it permitted the State to introduce other crimes evidence of his prior conviction for predatory criminal sexual assault of a child pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2012)). The defendant also contends that the prosecutor's highly inflammatory comments in closing argument regarding this other crime's evidence were not supported by the record and therefore denied him a fair trial. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The record before us includes the following relevant facts and procedural history. The defendant was arrested on August 28, 2013, and charged with, *inter alia*, two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)), four counts of sexual exploitation of a child (720 ILCS 5/11-9.2(a)(1) (West 2012)), and one count of aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2012)) of the 11-year-old victim, S.R.

¶ 5              A. Pretrial Motion to Permit Admission of Hearsay Evidence

¶ 6      Prior to trial, the State filed a motion seeking the introduction of statements made by the victim, S.R., to her grandmother, Phyllis R. and forensic interviewer Lauren Glazer, pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2012)), which, *inter alia*, permits the State to introduce hearsay testimony of a victim's outcry to another witness in prosecutions for sexual acts perpetrated against a child under the age of 13.

¶ 7      At the hearing on this motion, S.R.'s grandmother, Phyllis R., testified that she was 77 years old and that she lived with her two grandchildren, S.R., currently 14 years old and S.R.'s younger brother, currently 12 years old. Phyllis averred that the defendant was the stepfather of one of S.R.'s friends, and that this is how she came to know him. According to Phyllis, on August 2, 2013, the defendant came to her home claiming that he was in the neighborhood and had just

"dropped by to see how she was doing." The defendant had similarly stopped by her home two or three times in the past.

¶ 8     On August 2, 2013, the defendant visited for about 10 minutes and then indicated that he was ready to leave. The defendant told S.R. to walk him to the elevator because he had come up the stairs and did not know where it was. Phyllis then observed S.R., who was standing behind the defendant, shake her head "no," indicating that she did not want to go. The defendant left alone, but then returned a minute later, and asked Phyllis whether S.R. could be in a boys and girls club that he was supervising. Phyllis responded that S.R. was "getting ready to start school" and could not participate in the club. Phyllis found this request strange because it did not include an invitation for her grandson. When the defendant departed, Phyllis was upset because she did not know what was going on and because S.R. looked "nervous and scared." She asked S.R. "what was wrong" and why she did not want to walk the defendant to the elevator. Phyllis testified that, at first S.R. refused to say anything, but that when Phyllis told her that it was "ok to tell her anything," S. R. stated that the defendant had tried to rape her. S.R. told Phyllis that on the day that the defendant was supposed to take her to her friend's birthday party, instead, he took her to a house where he tried "putting his private part inside her vagina." S.R. told Phyllis that she "kept telling the defendant that it hurt" and that he eventually stopped. S.R. also stated that the defendant threatened her and told her not to tell anybody, and that this was why S.R. had not spoken to Phyllis about the incident before.

¶ 9     The parties then stipulated, *inter alia*, that Lauren Glazer would testify that she is employed by the Chicago Children's Advocacy Center, and that on August 26, 2013, she conducted a victim sensitive forensic interview (VSI) of S.R. from approximately 4:26 p.m. to 5:02 p.m.

Glazer would identify a recording of that interview with S.R. as a true and accurate depiction. The VSI was entered into evidence at the hearing.

¶ 10    After hearing counsels' arguments, the trial court granted the State's motion to introduce S.R.'s hearsay statements to Phyllis and Glazer at trial pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2012)).

B.  Pretrial Motion to Allow Other Crimes Evidence

¶ 11    Prior to trial, on November 13, 2014, the State also filed a motion pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2012)) seeking the admission of other crimes evidence, namely the defendant's prior sexual assault of 12-year-old A.P. which had occurred on October 1, 2001.  In that case, after A.P. informed her mother that she had missed a menstrual cycle and that she had sex with the defendant, who was the boyfriend of a family member, A.P.'s mother called the police.  In her interview with the police, A.P. reported that she would sometimes babysit five-year-old, T.T., who was her cousin's and the defendant's mutual child.  On one of these occasions, A.P. was lying on the couch and the defendant lay behind her and put her arms around her waist and then they had sexual intercourse. As a result, A.P. became pregnant with the defendant's child and subsequently underwent an abortion.  The defendant initially denied assaulting A.P., but when presented with evidence of her pregnancy admitted to having sexual intercourse with her on two occasions.  The defendant, who was 19 at the time, claimed that he did not know how old A.P. was but admitted that he knew that she was under 18 years of age. The defendant eventually pleaded guilty to predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2000)) and was sentenced to seven years' in prison.  The State argued that this prior bad act was relevant to prove intent and motive since evidence of a previous attack helps explain why the defendant would commit the current crime. The State also

argued that evidence of A.P.'s sexual assault was relevant to explain the absence of a corroborating witness in S.R.'s case resulting from the fact that the defendant targeted victims when they were alone.

¶ 12       On December 16, 2014, the defendant filed his response to the State's motion, objecting to the introduction of the other crimes evidence, on the basis that it was factually dissimilar, too remote in time and highly prejudicial.  In this respect, the defendant argued that in the 2001 case, the 12-year-old A.P. told the police that she initiated the sexual contact with the defendant, and that the only reason she told her mother about the sexual encounter was because she missed her menstrual cycle and feared that she was pregnant.  According to the defendant, during the police investigation, A.P. told the detective that the defendant did not initiate the sexual contact and stated "it was not rape" in that the act was not forced or against her will.  Additionally, T.T., who was also interviewed by the detective, stated that she was present at the house on the night that the defendant and A.P. had sex, that she was in the same room, and that she saw the defendant and A.P. lying on the couch with a cover over them, and the defendant lying behind A.P.  Based on these facts, the defendant argued that his prior offense, which occurred when he was only 19 years old, did not initiate the sexual contact, and did not partake in any alleged kidnapping, secrecy or confinement, was too remote and dissimilar to the instant case, so as to be highly prejudicial.

¶ 13       On February 27, 2015, the trial court granted the State's motion to introduce the other crimes evidence regarding the defendant's prior sexual assault of A.P.  The court stated that the evidence would be admitted and could be used both to show propensity and "other issues that may be appropriate based on the facts of the case as shown."

¶ 14                                      C.  Motion *in Limine*

5

¶ 15    After discovery, and immediately before trial, the defendant filed two motions *in limine*. The first requested that in presenting evidence of the defendant's prior predatory criminal sexual assault of A.P. the State be barred from introducing any testimony regarding A.P.'s pregnancy, her subsequent abortion, and the DNA paternity testing on the aborted fetal tissue that established that the defendant was the father of the child. The trial court granted this motion, holding that while the State could use the DNA test results on the aborted fetal tissue to establish that the defendant had sex with A.P. and that he fathered her child, the State was not permitted to introduce "any evidence that this [wa]s an abortion fetal sample." The court reiterated that the term "abortion" was not to be "alluded to or referred to directly in any manner," at trial.

¶ 16    The defendant's second motion *in limine* requested that the State be prohibited from using handwritten letters purportedly written by the defendant to his minor daughter, G.P., while he was in jail. The letters are disturbing and contain descriptions of sexually explicit subjects between the defendant and G.P. After hearing arguments by counsel, the trial court stated that because the State did not intend to introduce these letters in its case-in-chief, but rather would use them in cross-examination, only if the defendant chose to testify that he never had any sexual intercourse or interest in any minor girls, there was "nothing more to do in this regard." The letters were ultimately never presented to the jury.

¶ 17                            D.  Jury Trial

¶ 18    On October 3, 2016, the defendant proceeded to a jury trial at which the following relevant evidence was adduced. The victim, S.R. testified that she is 14 years old, and that for the past nine years, she has lived in an apartment at Roosevelt and Pulaski with her brother, and her grandmother, Phyllis.

¶ 19    S.R. stated that in 2013 she was 12 years old and in fifth grade. Two weeks after school

ended that summer, the defendant, who was the stepfather of one of S.R.'s friends, came to her house to take her to a birthday party. S.R. identified the defendant in open court, and testified that she knew him only as "Jamie," and as the stepfather of her good friend, T.A. According to S.R., the defendant asked her grandmother, Phyllis, whether he could take S.R. to a birthday party with T.A. and, T.A.'s sister, J.A, both of whom, he claimed, were waiting in his van downstairs. S.R. recalled that in giving her permission, Phyllis hurried her along because she did not want to the two girls to wait in the car for a long time.

¶ 20    S.R. went with the defendant, but when she arrived at the van, no one was inside. S.R. testified that after getting into the vehicle she still believed that she was going to a birthday party. Instead, however, the defendant drove her to a two-flat building at 2740 Monroe Street. The defendant used keys to enter the apartment. Once they were inside, S.R. went into the living room and sat on the couch. She watched as the defendant walked to a back room and reappeared in the hallway holding some covers. According to S.R., the defendant then walked into the second room from the door and laid the covers on the floor. S.R. testified that when she entered the second room, the defendant undressed her by removing her blue jean dress, her white stockings and underwear. After placing her clothes on the radiator, and with his clothes still on, the defendant instructed S.R. to lie down on the covers. He then proceeded to lick her vagina with his tongue. The defendant took all his clothes off and "laid on the side" of S.R. He moved his hand up and down on his penis and told S.R. to look over at him. S.R. saw some "white or gray stuff c[o]me out" of the defendant's penis, and onto her arm and belly.

¶ 21    S.R. testified that the defendant then tried to force his penis into her vagina, but that it caused her pain. S.R. stated that she repeatedly told the defendant that it hurt. She was crying, and scared, so the defendant told her that he "does it to his step-daughter T.A. as well." The

defendant also instructed S.R. to "take her two fingers and rub it against her private parts" when she is alone in her room so that the "next time won't hurt as much."

¶ 22    S.R. testified that after they dressed, the defendant took her to a McDonald's on Madison Street and bought her a Big Mac. While they were inside McDonald's, the defendant's wife and T.A.'s mother, Veria Head, telephoned. S.R. testified that she recognized Head's voice because she had spoken to her in the past. The defendant immediately told S.R. to "Shhh." S.R. then heard Head tell the defendant that she wanted her van back. The defendant and Head "yelled back and forth" on the telephone for about five minutes while inside the McDonald's. The defendant then indicated to S.R. to stand up and follow him to the van. The telephone conversation continued for another two minutes, as they returned to the van. After the call ended, the defendant drove S.R. home. During that ride, he instructed S.R. that if she told anyone about what he had done, "it would happen again." S.R. averred that she initially kept quiet about the incident because she was scared.

¶ 23    She stated that she eventually told her grandmother what happened because the defendant appeared uninvited at her house in late July 2013. While S.R. could not recall the exact date, she remembered that it was at the day that her grandmother "received money on her card." The defendant told Phyllis he was in the neighborhood for a funeral and wanted to see whether S.R. would join a boys and girls club he was supervising. When Phyllis, unaware to the tension between S.R. and the defendant, asked whether the defendant could take S.R. across the street to get her money from the bank, S.R. furtively shook her head "no" to her grandmother. After observing S.R.'s reaction, Phyllis pretended that she had forgotten what she wanted. The defendant then asked if S.R. could walk him to the elevator, but Phyllis said "no" and the defendant left on his own.

¶ 24    S.R. stated that when her grandmother asked her why she did not want to go with the defendant, she told her about the sexual assault. S.R. subsequently spoke to the police and then gave an interview at the Chicago Children's Advocacy Center. At trial, S.R. identified numerous photographs of the outside of the two-flat located at 2740 Monroe Street, the inside of the apartment at that address, the covers that the defendant had laid on the floor and the radiator where he had placed S.R.'s clothes.

¶ 25    Phyllis R. testified that she is 79 years old and that she lives at 4041 West Roosevelt Road with her two grandchildren. Phyllis stated that she has been S.R.'s legal guardian since S.R. was one week old. She recalled that during the summer of 2013, S.R. had a friend named T.A., who came over and spent the night at her house a couple of times. Phyllis testified that she had also met the defendant, who was T.A.'s stepfather. Although she could not recall the exact date, Phyllis stated that one day in the summer of 2013 the defendant came to her apartment and asked whether he could take S.R. to a dinner party for T.A. The defendant told Phyllis that his stepdaughters were in the car downstairs. Phyllis stated that she allowed S.R. to go with the defendant because he was a church member and was active in the school. She also stated that she trusted him because he seemed "really nice" and would occasionally stop by her apartment to "check on her."

¶ 26    Phyllis testified that sometime in August 2013, before school started, the defendant again stopped by her home. After they talked for a few minutes, Phyllis asked the defendant whether he could go across the street with S.R. and cash her check for her. The defendant agreed, but S.R., who stood behind the defendant, shook her head to Phyllis indicating that she did not want to go with the defendant. The defendant could not see S.R. because she was standing behind him. After observing her granddaughter, Phyllis told the defendant that she could wait on the

check. The defendant then asked Phyllis whether S.R. could be in a club that he was supervising, but S.R. shook her head at her grandmother again. Phyllis told the defendant that S.R. already had "enough as it [wa]s," and that she could not join the club. Before leaving, the defendant asked S.R. to walk him out to and show him where the elevator was. Phyllis thought this was unusual because the defendant had to pass by the elevator to get up to her apartment. She stated that when the defendant left, she immediately turned to S.R. and asked her what that was "all about."

¶ 27    According to Phyllis, S.R. burst into tears and told her that the defendant had sexually assaulted to her. S.R. told Phyllis that instead of taking her to T.A.'s birthday party, the defendant drove her to a house, where he put his penis into her vagina. S.R. also told Phyllis that the defendant subsequently took her to a McDonald's and told her that "she had better not tell anyone or he was coming back." Phyllis stated that after hearing the details of the sexual assault, she burst into tears because she felt "hurt" for S.R. and blamed herself for having let S.R. go with the defendant.

¶ 28    After Phyllis' testimony, the State published certified copies of the defendant's and S.R.'s birth certificates to the jury. These documents established that S.R. was born on March 30, 2002, and that the defendant was born on September 15, 1981. At the time of the sexual assault, S.R. was 11 years old and the defendant was 31. The age difference between them was 20 years.

¶ 29    Veria Head next testified that she is the defendant's ex-wife, and that she lived with him until May 2013. Head has three children, none of whom were fathered by the defendant. Two are daughters and were born before she began dating the defendant. Head met the defendant through Alpha Baking Company, where they both worked in 2010. At that time, the defendant went by "Jamie" instead of "Bernard." A year later, they were married and moved into 733

South Lavergne Avenue, with Head's daughters, T.A. and J.A. T.A. was good friends with S.R. and they had known each other from grade school.

¶ 30     Head testified that sometime near the end of June 2013, she lent her van to the defendant so that he could go see his brother. While she could not recall the exact date, she remembered that it was the same day that the defendant quit his job at the Alpha Baking Company. Around noon that day, Head spoke to the defendant on the telephone and the defendant told her that he was out eating with his brother. Head testified that during this conversation, she could initially hear many people in the background. The defendant then stated that he would go outside and talk to her where there was less noise. The defendant told Head that he would return her van as soon as he and his brother were finished eating. Later that day, at about 1:50 p.m., Head again telephoned the defendant to ask why he had not returned her van and to remind him that he was scheduled to work at 2:30 p.m. She and the defendant argued, and the defendant told her that he was not going to work that day. The defendant eventually returned Head her van a little after 2:30 p.m.

¶ 31     Head acknowledged that on June 28, 2013, she threw her middle daughter, J.A. a birthday party at Enchanted Castle in Bolingbrook. She stated that the defendant attended the party with her. Head also acknowledged that S.R. did not come to the party. She explained that S.R. had telephoned her the night before to ask whether she could ride with her, but Head apologized and told her that she did not have enough room in her car.

¶ 32     Alpha Baking Company's director of payroll and human resources, Deborah Johnson-Bey next testified that based on the company's records, the defendant quit his job on June 19, 2013.

¶ 33     Rosie-Hicks Patton next testified that in 2013, she was the executive assistant of the Sanafko

House, a 58-unit housing facility for youths aging out of foster care, and grandparents raising grandchildren, located at 4041 West Roosevelt Road. According to Hicks-Patton, all visitors to the Sanafko House were required to provide an ID and sign a log at the registration desk before entering. Hicks-Patton knew that Phyllis lived in unit 412 with her grandson and granddaughter, S.R. Hicks-Patton testified that Phyllis' visitor log showed that "B. Davis" visited her apartment on June 19, 2013, from 11:30 to 11:35 a.m. and that "Bernard J. Davis" visited the apartment on August 2, 2013, from 9:50 a.m. to 10:15 a.m.

¶ 34    Chicago Police Detective Alisa Gladney next testified that on August 10, 2013, she was assigned to S.R.'s case. Detective Gladney arranged for S.R.'s VSI at the Chicago Children's Advocacy Center on August 26, 2013. During that interview, S.R. was alone in the room with forensic interviewer, Lauren Glazer, and spoke only to her, while Detective Gladney, DCFS worker, William Cursor, and Assistant State's Attorney (ASA) Brian Shaw, observed via a one-way glass. The VSI was published to the jury. In it, S.R. describes the sexual assault in detail. S.R.'s VSI is entirely consistent with her testimony at trial.

¶ 35    Detective Gladney testified that after she watched the VSI, on August 28, 2013, she interviewed the defendant at the police station. Detective Gladney testified that during this interview, the defendant initially told her that he had never been to S.R.'s house and had never had any conversation with S.R.'s grandmother. After talking to the detective for about ten minutes, however, the defendant changed his story and stated that he had talked to S.R.'s grandmother, but that it had been a long time ago. The defendant eventually acknowledged that on one occasion he had visited the Sanafko House, where after signing in and showing his ID, he went up to and inside S.R.'s apartment. Detective Gladney testified that when she confronted the defendant with S.R.'s allegations, the defendant denied any wrongdoing and stated that S.R. had

made the allegations up because she thought he was "cute." Detective Gladney placed the defendant under arrest for predatory criminal sexual assault of a child.

¶ 36    Following her arrest of the defendant, Detective Gladney proceeded to 2740 West Monroe Street, where she was let into the premises by the owner's son. The detective called for an evidence technician to take pictures of the entry, the house, and the apartment. At trial, she identified those photographs, and testified that the apartment was "exactly like S.R. had described it" in the VSI.

¶ 37    The State next presented its other-crimes evidence, prior to which the jury was instructed as to its limited purpose. Freeport Police Department Deputy Chief of Police, Detective Matthew Summers, first testified that in 2001 he was involved in the investigation of the sexual assault of A.P., a 12-year-old female victim. He identified A.P.'s birth certificate, which noted her birthday as February 12, 1989. Detective Summers next identified a certified copy of the charging document in A.P.'s case and testified that the defendant pleaded guilty to the charge. The document states in relevant part:

> "[D]uring the 1st day of October, 2001 at and within Stephenson County, Illinois [the defendant] did commit the offense of predatory criminal sexual assault of a child *** in that said defendant who was 17 years of age or older, committed an act of sexual penetration with [A.P.], who was under 13 years of age when the act was committed, in that said defendant placed his penis in the vagina of [A.P.]

Detective Summers also identified a certified copy of the defendant's May 17, 2002, conviction for predatory criminal sexual assault of a child in A.P.'s case. That conviction showed that the defendant was sentenced to 7 years' imprisonment. He also identified A.P.'s and

¶ 38    Detective Summers also testified that during his investigation of A.P.'s case, he was involved

in the collection of physical evidence. On December 17, 2001, Detective Summers went to a medical facility in Rockford, Illinois, where A.P. was being treated. While there, the detective met A.P.'s treating physician, who gave him, *inter alia*, a blood standard from A.P. and a tissue sample. Detective Summers took the blood standard and tissue sample to the Illinois State Police Crime Lab in Rockford (Rockford crime lab) for DNA testing. He further testified that on February 4, 2002, he met with the defendant to obtain his blood standard. The detective remained present while the nurse pricked the defendant's finger to supply five drops of blood on a card. The blood card was also submitted to the Rockford lab for DNA analysis.

¶ 39    Former Rockford crime lab forensic scientist, James E. Bald, testified that he received the blood standards obtained from A.P. and the defendant, and the tissue sample obtained from A.P., and conducted DNA analysis with the purpose of obtaining comparable DNA profiles. Northeastern Illinois Regional Crime Laboratory forensic scientist, M. Kelly Lawrence, stated that she obtained these DNA profiles from the Rockford crime lab and analyzed them to determine whether the defendant could be the biological father of the tissue sample obtained from A.P. Lawrence opined, to a reasonable degree of scientific certainty, that there was a 99.9999999 percent chance that the defendant was the father of the tissue sample.

¶ 40    After the close of the State's case-in-chief, the defendant called only one witness, Tanesha Barron. Barron testified that she was a close friend of the defendant's ex-wife, Vera Head, whom she had met through church. Barron averred that on June 28, 2013, her daughter and T.A. had a joint birthday party at Enchanted Castle in the western suburbs. The party was from about 4 p.m. to 8:20 p.m. and included about ten to eleven children and seven adults. Barron averred that the defendant was present at the party. She saw the defendant arrive with

Head, and later greet guests at the door. Barron did not see the defendant leave and did not know whether he left prior to her.

¶ 41    After the defense rested, the parties proceeded with closing arguments. The State argued that the evidence offered at trial had proven beyond a reasonable doubt that through trickery, on June 19, 2013, the defendant lured S.R. to his van, from where he drove her to the two-flat on Monroe Street, and then sexually assaulted her. The State also argued that the defendant had threatened S.R. with silence telling her that if she told anyone the sexual assault would "happen again." The State argued that the defendant had frightened S.R. so much that she may have kept silent about the sexual assault, but that he made the mistake of returning to her apartment and trying to find a way of being alone with her again. The State pointed to S.R.'s courage in defying the defendant by nodding her head to her grandmother and then speaking about the sexual assault.

¶ 42    In response, in closing, defense counsel argued that the State had failed to offer any reliable testimony of the defendant's guilt. According to defense counsel, S.R.'s testimony was a "made-up story" of an 11-year-old girl, which was not corroborated by any physical evidence. Instead, defense counsel argued, "much of the concrete, reliable [DNA] evidence was about something that happened 15 years ago, a case that involved A.P." According to defense counsel, however, in that case, which was "a paternity case," the defendant pleaded guilty and took full responsibility for the mistake he had made. Defense counsel questioned the weight to be given to this "prior mistake," where the State did not call A.P. to testify and explain what happened. As defense counsel argued:

>     "They went to great lengths. They called detectives—Chief Deputy Summers, DNA analysis Jim Bald, paternity expert Kelly Lawrence. Do you know who we didn't hear from?

The person who could give you meaning to this instruction, [A.P.]. She could tell you the truth of what happened and whether this was a mistake or if it's what they're saying.

He's a sexual predator. Those are the words that they're calling him. But you're missing that piece of the puzzle. And, ladies and gentlemen, that is the entire piece of the puzzle.

And they didn't call [A.P.]. Why not? You have to ask yourself. Because without [A.P.] that mistake, 2001, 15 years ago, really doesn't help you answer this critical important question: Did [the defendant] do this [instant crime] or not?"

¶ 43 In rebuttal, the State argued that it was not required to present any physical evidence to prove the defendant sexually assaulted S.R. Over defense counsel's objections, the State argued that while it had the burden to prove the defendant guilty, that burden was not "made special" for the defendant, or "somehow insurmountable," or "a burden that requires any DNA evidence." Instead, the State pointed out, it is a burden to prove the defendant guilty beyond a reasonable doubt, which must be and is "proven every day in this courthouse and throughout the nation," and that the State "gladly accept[s] in this case." The State then pointed out that S.R.'s testimony, corroborated by her VSI and her outcry to Phyllis, a month after the assault, were sufficient to prove the defendant guilty beyond a reasonable doubt.

¶ 44 The State further argued that the jury was permitted to consider A.P.'s case as evidence of the defendant's propensity to commit similar sexual offenses, even without A.P.'s own testimony as to this offense. As the State contended:

"[The defendant] wasn't an innocent man back in 2001 when he was downstate in another county and he was with a child victim 12 years of age. And he was not an innocent man in 2002 when he was convicted. And you will have this certified copy of conviction which is

entered into evidence. You can consider this as propensity evidence that he is not an innocent man and that he is a child sexual predator.

He was a child sexual predator back in 2001 when he was with a child. There is no such thing as a relationship between a child who is 12 years old and a man who is 20 years old. *** This child—This child had a child inside of her and he was the father. He is a child sexual predator. Of course, she would be reluctant to testify. And why would she want to come back in here and be reminded of the horrors--

***

What child would want to come back in here after all these years and have to remember that she had a child with a sexual predator? Who wants to be reminded of that?

So, let's get that straight. This is propensity evidence. He was convicted of that child crime back in 2002. He was a child predator in 2013, and the evidence proves him guilty today in 2016."

¶ 45   After hearing closing arguments, the jury began their deliberations. While the jury was deliberating, the defendant moved for mistrial based on several comments made by the State in rebuttal. Among other things, the defendant argued that the State's arguments regarding A.P.'s reluctance to testify, and the State meeting "the burden of proof beyond a reasonable doubt in cases all over the country and courtrooms throughout this building" were improper and prejudicial and prevented him from receiving a fair trial. The trial court denied the defendant's motion. In doing so, the trial court found that the State's comments regarding its burden of proof were generally appropriate. With respect to the other crimes evidence, the trial court ruled that although the defendant was correct that no evidence was presented at trial that A.P. was reluctant to testify, the State's argument to that effect was of "minimal impact" and did not prejudice the

17

jury since the fact that A.P. was sexually assaulted "was not only not contested, but [was] essentially acknowledged by the defense and by the defense argument."

¶ 46     The jury found the defendant guilty of both counts of predatory criminal sexual assault of a child, one count of aggravated kidnapping, and one count of sexual exploitation of a child.

¶ 47     After the defendant's motion for a new trial was denied, the parties proceeded with sentencing. In aggravation, among other things, the State offered into evidence the letters written in jail by the defendant to his minor biological daughter G.P., who occasionally lived with Head. The letters were authenticated by Head, as written by the defendant. As already noted above, in these rather disturbing letters the defendant explicitly describes his prior sexual relations with two minors, G.P., and T.A., and of his sexual fantasies regarding G.P., while he is awaiting trial.

¶ 48     In mitigation, defense counsel agreed that because of his prior conviction for predatory criminal sexual assault of a child, the defendant was subject to a mandatory natural life sentence (see 720 ICLS 5/12-14.1-D(2) (West 2012)), but argued that the defendant had the support of his mother and aunt, was "polite" as a client, and was "more" than these convictions.

¶ 49     The trial court merged the single count of sexual exploitation of a child with the two counts of predatory criminal sexual assault of a child and sentenced the defendant to natural life in prison for that crime. The trial court also imposed a consecutive 30-year prison sentence for aggravated kidnapping. The defendant now appeals.

¶ 50                                    II. ANALYSIS

¶ 51                          A. Quantity of Other Crimes Evidence

¶ 52     On appeal, the defendant first contends that the trial court erred when it permitted the jury to

hear an "excessive" amount of other-crimes evidence regarding his 2002 conviction for predatory criminal sexual assault of A.P. The State initially responds that the defendant has forfeited this issue by failing to object to the introduction of the other crimes evidence as "excessive" and for failing to make this argument in his written motion for a new trial. For the reasons that follow, we disagree with the State.

¶ 53     It is well-established that to preserve a claim for review, a defendant must both: (1) object to the error at trial; and (2) include the alleged error in his written posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) (citing *People v. Enoch*, 122 Ill.2d 176, 186 (1988)). Contrary to the State's position, however, the defendant need not raise his argument "in precisely the same way in order to preserve it on appeal." *People v. Minter*, 2015 IL App (1st) 120958, ¶ 42. So long as the substance of the argument is maintained on appeal, and the trial court has an opportunity to address the general issue below, there will be no forfeiture. *Minter*, 2015 IL App (1st) 120958, ¶ 42; see also *e.g.*, *People v. Heider*, 231 Ill.2d 1, 18 (2008) (holding that the defendant did not forfeit appellate review of an issue where the trial court had an opportunity to address the issue below and the defendant did not raise a "completely different objection" on appeal); *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008) (rejecting State's forfeiture argument because the defendant did not need to make an objection "on identical grounds" to preserve it for appeal; the fact that defendant objected to the claimed error at trial and in his posttrial motion was sufficient); *People v. Maness*, 184 Ill. App. 3d 149, 152 (1989) (holding that issue of admissibility of extraneous other crimes evidence was not forfeited because it was brought to the trial court's attention "in some manner," albeit not in exactly the same form as when it was presented on appeal.)

¶ 54     In the present case, contrary to the State's position, although on appeal the defendant couches

his argument as an objection to the admission of the "excessive" quantity of other-crimes evidence, he is essentially arguing, just as he did below, that the prejudicial nature of that evidence far outweighed its probativeness. Whether the defendant now argues that the volume of such evidence was "excessive" or "tantamount to a mini-trial" are simply aspects of the same legal argument presented to and considered by the trial court below.

¶ 55    The record establishes that the defendant repeatedly objected to the introduction of other-crimes evidence prior to, during, and after trial, maintaining that it was more prejudicial than probative and would unfairly influence the jury. Defense counsel initially objected to the introduction of any of the other crimes evidence regarding A.P. as far too remote and dissimilar to constitute propensity evidence. When the trial court overruled defense counsel's objection and permitted the State to introduce this evidence, defense counsel filed a separate motion *in limine* arguing that in the very least the other crimes evidence should be restricted to prohibit the State from introducing any evidence that A.P. became pregnant by the defendant or that she had an abortion in 2001. The trial court ruled that the State would be permitted to introduce evidence regarding the defendant's paternity of A.P.'s child, but that "abortion" was not to be referenced or alluded to in any way before the jury. Defense counsel again objected to the introduction of the other-crimes evidence during trial. Immediately prior to Detective Summer's testimony, defense counsel renewed his "initial objection to the proof of other crimes" and requested a limiting instruction on propensity. An in-depth discussion followed, during which the trial court reiterated its prior holdings on this issue. Finally, after trial, in his written motion, defense counsel again argued that the trial court had erred in permitting the admission of all of the other-crimes evidence, including any evidence regarding A.P.'s pregnancy, abortion and subsequent DNA testing of the aborted fetal tissue. Under this record, we are compelled to conclude that,

contrary to the State's position, the defendant in no way forfeited this issue for purposes of appeal. Accordingly, we proceed with the merits.

¶ 56    We initially note that it is undeniable that by its very nature, other-crimes evidence is prejudicial to a defendant. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45. Generally, the risk associated with the admission of other-crimes evidence is that it might prove "overly persuasive to a jury, who may 'convict the defendant only because it feels he or she is a bad person deserving punishment.' " *People v. Ward*, 2011 IL 108690, ¶ 24 (quoting *People v. Lindgren*, 79 Ill.2d 129, 137 (1980)). Under certain circumstances, however, the probative value of other-crimes evidence is considered to outweigh its prejudicial effect, rendering it admissible. *People v. Donoho*, 204 Ill. 2d 159, 170 (2006). For example, under the common law, other crimes evidence may be admissible for the limited purpose of establishing motive, identity, presence, *modus operandi*, knowledge, intent common design or absence of mistake. *Id*. Regardless of probative value, however, under the common law the introduction of other crimes evidence is not permitted for the purpose of establishing the defendant's propensity to commit crimes. *Id*.

¶ 57    Our legislature, however, has chosen to create a limited exception to this general rule against the admissibility of propensity evidence. Specifically, section 115–7.3(b) of the Code provides that where a defendant is accused of certain enumerated sex offenses, including, relevant to this appeal, predatory criminal sexual assault of a child, the State is permitted to introduce evidence that the defendant committed other similar specified sex offenses in the past. 725 ILCS 5/115–7.3(b) (West 2012). The statute expressly permits this type of other-crimes evidence to be admitted for *any relevant purpose*, including the defendant's propensity to commit sex offenses. See 725 ILCS 5/115–7.3(b) (West 2012) (Evidence of another criminal sexual assault "may be

21

admissible *** and may be considered for its bearing on any matter to which it is relevant."); see also *Ward*, 2011 IL 108690, ¶ 25; *Donoho*, 204 Ill. 2d at 176.

¶ 58      Just like the common law, however, before the other-crimes evidence may be used, section 115-7.3 requires the court to apply a balancing test, weighing the probative value of the evidence against the undue prejudice it may produce against the defendant. 725 ILCS 5/115–7.3(c) (West 2012). In doing so, section 115-7.3 provides that the court may consider the following factors: (1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) "other relevant facts and circumstances." 725 ILCS 5/115–7.3(c) (West 2014).

¶ 59      Our supreme court has long urged trial courts "to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 203 Ill. 2d at 186. "When weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury." *Perez*, 2012 IL App (2d) 100865, ¶ 47; see also *People v. Boyd*, 366 Ill.App.3d 84, 94 (2006) (other-crimes evidence must not become a focal point of the trial, and the detail and repetition admitted must be narrow so as to avoid the danger of a trial within a trial). Nonetheless, "the actual limits on the trial court's decision on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest." *People v. Walston*, 386 Ill. App. 3d 598, 621 (2008).

¶ 60      We review the trial court's ruling on the admissibility of other-crimes evidence for an abuse

of discretion. *Donoho*, 204 Ill. 2d at 182. An abuse of discretion occurs when the ruling is arbitrary, fanciful, and unreasonable or when no reasonable person would adopt the position taken by the trial court. *Id.*

¶ 61    In the present case, on appeal, the defendant concedes that evidence regarding A.P.'s sexual assault fulfilled the requirements of section of 115-7.3 (namely proximity and degree of factual similarity to the charged offense) and that it was relevant and probative of the defendant's propensity to commit such assaults. He nonetheless takes issue with the magnitude of the other-crimes evidence introduced by the State at trial and argues that it unfairly prejudiced the jury. The defendant contends that the excessive volume of testimony and detail pertaining to A.P.'s case resulted in a "mini trial" of those facts, and unfairly drew the jury's attention away from the facts of S.R.'s case. Specifically, the defendant objects to the introduction of the forensic evidence in A.P.'s case, which referred to the defendant impregnating A.P., and, which, he claims, improperly alluded to A.P. having an abortion.

¶ 62    In support of his argument, the defendant cites to the decision in *People v. Cardamone*, 381 Ill. App. 3d 462 (2008), for the proposition that an excessive quantity of other-crimes evidence used to show propensity may render it unduly prejudicial. For the reasons that follow, we disagree and find that case inapposite.

¶ 63    We first note that *Cardamone* did not purport to hold that anytime the evidence of other crimes is voluminous, the prejudicial effect renders the other-crimes evidence inadmissible. See *Perez*, 2012 IL App (2d) 100865, ¶ 49. Indeed, *Cardamone* recognized that section 115-7.3 permits other-crimes evidence to be introduced for substantive purposes and that determining whether the nature and quantity of the evidence is excessive is left to the trial court's discretion. *Id.* at 497 (noting that "[c]learly, some of the evidence was admissible and it is difficult to

determine precisely where to draw the line" (emphasis added)).  Moreover, we have previously held that "*Cardamone*'s application of section 115–7.3 to the circumstances of that case likely reflects the 'outer bounds' of the rule, leaving more 'subtle inner striations' to determining when the volume of other-crimes evidence admitted under section 115–7.3 becomes unduly prejudicial." *Perez*, 2012 IL App (2d) 100865, ¶ 49 (quoting *Walston*, 386 Ill. App. 3d at 619). Therefore, while undue prejudice can arise in a section 115–7.3 case, "the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115–7.3 are relatively modest, especially when combined with the highly deferential abuse-of-discretion standard that governs review of such trial court decisions." *Walston*, 386 Ill. App. 3d at 619; see also *Perez*, 2012 IL App (2d) 100865, ¶ 49.

¶ 64    Furthermore, *Cardamone* is factually distinguishable from the instant case.  In *Cardamone*, the trial court admitted testimony regarding what the appellate court conservatively estimated to be between 158 and 257 uncharged prior sexual acts against minors.  *Cardamone*, 381 Ill. App. 3d at 497.  The appellate court noted that, "unlike a case were the trial court might admit other-crimes evidence as it pertains to 1 or even 2 victims, the court here found admissible numerous acts alleged by 15 victims." *Id*. at 494.  Furthermore, the court explained that the "admission of so many allegations of uncharged conduct, many of which were vague as to dates, places defendant in the impossible position of accounting for his whereabouts and behavior almost all day, every day, over a three-year period." *Id*.  " 'Simply put, *Cardamone* was an extreme case.' " *People v. Arze*, 2016 IL App (1st) 131959, ¶ 99 (quoting *Perez*, 2012 IL App (2d) 100865, ¶ 49.

¶ 65    In contrast, in the instant case, the State presented evidence regarding a single prior other crime committed by the defendant against A.P.  This evidence consisted of the succinct testimony of only three witnesses.  First, Detective Summers testified that the defendant pleaded

guilty to predatory criminal sexual assault against A.P. in 2002, and identified the following exhibits: (1) A.P.'s birth certificate; (2) the defendant's certified 2002 conviction for predatory criminal sexual assault; and (3) the certified bare-bones charging document in that case. Second, two forensic scientists testified that the DNA profiles collected from the defendant's blood sample and A.P.'s blood and tissue samples after that sexual assault established the defendant's paternity of A.P.'s child. This meager testimony relating to a single prior bad act, was therefore neither excessive nor overly detailed, and came nowhere close to the volume of evidence found to be prejudicial in *Cardamone*.

¶ 66    Nonetheless, the defendant asserts that it would have been sufficient to present the defendant's 2002 certified conviction and information about A.P.'s sexual assault, without any testimony by the forensic experts regarding DNA and paternity. He claims that testimony that the defendant "was the father of the tissue sample" obtained from A.P. focused the jury on the fact that A.P. had an abortion. For the reasons that follow, we disagree.

¶ 67    Adhering to the trial court's express instruction not to make any reference to abortion, in offering evidence of A.P.'s sexual assault, the State nowhere elicited testimony, or argued that A.P. had an abortion. Instead, the DNA testimony was offered to corroborate the fact that the defendant committed the crime in the first place. Since A.P. did not report the sexual assault to her mother until at least a month after it had occurred, when she feared that she could be pregnant, the only DNA evidence available to the State to establish that the defendant committed the sexual assault was from the paternity test. In addition, before presenting any of the other crimes evidence, the court issued a limiting instruction to the jury, stating that the jury was permitted to use this evidence only for purposes of determining the defendant's propensity to commit sexual offenses. Accordingly, since the DNA evidence was brief, and made no reference

or allusion to an abortion, but was rather offered in place of A.P.'s testimony to corroborate the defendant's commission of the crime, and the jury was instructed on the limited purpose of this testimony, we see nothing prejudicial in its introduction at trial.

¶ 68     Regardless, even if we were to agree with the defendant that the DNA testimony was excessive, we would nonetheless find that any error in its admission was necessarily harmless in light of the overwhelming evidence of the defendant's guilt presented at trial. The evidence clearly established that the defendant was 31 years old when he sexually assaulted S.R. and that she was 11. At trial, S.R. testified in detail about the sexual assault. She explained how the defendant, who she trusted as T.A.'s stepfather, lured her into a van by pretending to be taking her to a birthday party with her friends, and how instead, he took her to an apartment at 2740 Monroe Street, where he sexually assaulted her by licking her vagina, masturbating, and trying to place his penis into her "private part." S.R. further testified that after the sexual assault the defendant took her to a McDonald's, where she heard him arguing on his cell phone with T.A.'s mother about why he had not returned the van to her yet. This testimony was corroborated by Head herself, who stated that in June 2013, on the same day that the defendant quit his job at Alpha Baking Company, she permitted him to use her van, and that when he did not return it in a timely manner, she telephoned him to inquire why. Head stated that while she spoke to the defendant, she could hear noises in the background, which were consistent with him being inside a restaurant.

¶ 69     Evidence at trial further confirmed that the defendant quit his job on June 19, 2013, and that on that same date he visited S.R.'s apartment, according to the visitor's log that he signed at the Sanafko House, where she lived.

¶ 70     At trial, S.R. also explained her initial reluctance to tell anyone about the sexual assault. She

testified that the defendant had threatened her that if she told anyone it would "happen again." She explained that she ultimately told her grandmother what happened only after she saw the defendant at her house about a month later. The records of the Sanafko House establish that this second visit occurred on August 2, 2013. S.R.'s outcry was corroborated by Phyllis' testimony that about a month after the sexual assault, S.R. told her truth about what had happened only because the defendant "stopped by" their home and persistently attempted to get S.R. alone with him.

¶ 71     S.R.'s trial testimony was also fully corroborated by the statement she made to police through her VSI at the Chicago Children's Advocacy Center. This statement was published to the jury and is exceedingly consistent with S.R.'s testimony at trial.

¶ 72     In addition, the jury was presented with numerous photographs of the location and layout of the apartment where the defendant took S.R. to carry out his sexual assault. These were consistent with S.R.'s descriptions to the police. As Detective Gladney testified, the apartment was "exactly like S.R. had described it."

¶ 73     The defendant offered no evidence at trial that contradicted S.R.'s of Phyllis's version of events. Under this record, we find that the evidence of the defendant's guilt was so overwhelming that the jury would have found him guilty of predatory criminal sexual assault of S.R., regardless of whether any other-crimes evidence about A.P. had been presented to them. As such, we conclude that any error in the admission of the other-crimes evidence was necessarily harmless. See *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) ("improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission.")

¶ 74     By way of a single sentence the defendant, nonetheless, claims that the error could not have

been harmless because the jury was also told by S.R. that while the defendant was sexually assaulting her, he told her that he also "does it" to his stepdaughter. While the defendant does not take issue with the admissibility of this statement as it was made during the commission of the offense (see *People v. Embry*, 249 Ill. App. 3d 750, 763 (1993)), and, as such, did not object to it at trial, he contends that when viewed in light of the quantity of other-crimes evidence offered in A.P.'s case, it gave the jury "yet another reason to convict [him] because he was a bad person, and not based on whether the State's evidence proved beyond a reasonable doubt that he assaulted S.R." For the reasons that follow, we disagree.

¶ 75      Aside from S.R.'s single statement regarding what the defendant told her while sexually assaulting her, the State presented no evidence whatsoever regarding the defendant's sexual relationship with T.A. or any alleged crime he had perpetrated against her. Rather, S.R.'s statement was presented to the jury solely to show the lengths to which the defendant would go to convince the crying and resisting 11-year-old S.R. that what he was doing to her was acceptable. As such, we find that the outcome of the defendant's trial was in no way impacted by this singular statement.

¶ 76                    B. Prosecutor's Comments in Closing Argument

¶ 77      The defendant next claims that the State made prejudicial remarks during closing argument that denied him a fair trial. Specifically, the defendant contends that it was improper for the State: (1) to explain in closing argument that A.P. had not testified during trial because she did not want to be "reminded of the horrors" of being impregnated; and (2) to refer to the defendant as a "child sexual predator." The defendant argues that these comments were not supported by the evidence, and were highly inflammatory, so as to justify reversal. For the reasons that follow, we disagree.

¶ 78       It is well-established that prosecutors are given wide latitude in making closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Reversal based on closing argument is warranted only if a prosecutor made improper remarks that engendered "substantial prejudice," *i.e.*, if the remarks constituted a material factor in the defendant's conviction. *Wheeler*, 226 Ill. 2d at 123. In closing, the State may comment on the evidence presented and draw reasonable inferences therefrom. Pe*ople v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Additionally, the State may attack a defendant's theory of defense (*People v. Doyle*, 328 Ill. App. 3d 1, 12 (2002)), and, during rebuttal, may respond to comments made by the defendant which invite a response (*People v. Kliner*, 185 Ill.2d 81, 154 (1998)). However, a prosecutor may not make assumptions and statements of fact not based upon evidence" nor "thinly veiled, emotion-laden appeals to the jury" that shift the focus of attention away from the actual evidence in the case. *People v. Johnson*, 208 Ill. 2d 53, 83-84 (2003). On review, we consider the challenged remarks in the context of the entire record as a whole, and in particular the "closing arguments of both the prosecutor and the defense attorney." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 62.

¶ 79       The appropriate standard of review for closing arguments is currently unclear. In *Wheeler*, 226 Ill. 2d at 121, our supreme court applied a *de novo* standard of review to the issue of prosecutorial statements during closing arguments. However, the *Wheeler* court also cited with favor its decision in *People v. Blue*, 189 Ill.2d 99, 128 (2000), which applied an abuse of discretion standard. In the instant case, however, we need not resolve the issue of the proper standard of review, since our holding would be the same under either standard. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 76–77 (acknowledging conflict regarding standard of review).

¶ 80       In the present case, we find that the challenged remarks were proper because they were made

in direct response to defense counsel's closing argument and because they were based on reasonable inferences adduced from the evidence. In this respect, the record reveals that it was defense counsel during his closing argument who first mentioned A.P.'s reluctance to testify at trial and who called the defendant a "sexual predator." Defense counsel argued that in 2001, the defendant was involved in a sexual relationship with A.P, for which he took full responsibility by pleading guilty, and that that case had been a "paternity case." Defense counsel repeatedly invited the jury to ask themselves why they had not heard from A.P., and then argued that she could "tell [them] the truth of what happened and whether this was a mistake or if it's what [the State's] saying," namely that the defendant was a "sexual predator."

¶ 81    In response, in rebuttal, the State noted that the evidence at trial had established that the defendant was a sexual predator in 2002 based on his prior conviction for predatory criminal sexual assault of A.P., and in 2013, based on the uncontroverted evidence presented at trial as to what he did to S.R. 720 ILCS 5/11-1.40(a)(1) (West 2012). As part of this argument, the State also addressed defense counsel's repeated reference to A.P.'s reluctance to testify and her ability to clarify to the jury that that prior offense had been just a "mistake." The State countered by arguing:

> "Of course, she would be reluctant to testify. And why would she want to come back in here and be reminded of the horrors?
>
> * * *
>
> What child would want to come back in here after all these years and have to remember that she had a child with a sexual predator? Who would want to be reminded of that?"

¶ 82    Contrary to defense counsel's assertion, this rhetorical question could reasonably be inferred

30

from the evidence presented at trial, namely the DNA analysis which indisputably established that the defendant, who was an adult, fathered A.P.'s child when she was only 12 years old. Under this record, and viewing the entirety of the closing arguments, we cannot hold that the State's comments amounted to unreasonable inferences or misled the jury as to the evidence.

¶ 83    Nonetheless, even if we accepted the defendant's contention that the Sate's comments were not based on the evidence, it is clear from the record that the misstatements were not substantially prejudicial, and therefore do not require reversal.  See *People v. Schneider*, 375 Ill. App. 3d 734, 755 (2007) (improper argument by the State constitutes reversible error only where "there is doubt as to whether the jury would have rendered a guilty verdict absent any improper comments.")

¶ 84    As already discussed in detail above, the evidence of the defendant's guilt at trial was overwhelming.  Moreover, the trial court instructed the jury that closing arguments do not constitute evidence and that they should disregard any statements not based upon the evidence. In addition, the trial court properly instructed the jury on the State's burden of proof.  The court also made sure that the jury understood that any other-crimes evidence was to be considered for the limited purpose of determining the defendant' propensity to commit sexual offenses.  As the trial court noted "It is for you to determine whether the defendant was involved in that offense, and, if so, what weight should be given to this evidence on the issue of propensity to commit sexual offenses." Under this record, we conclude that the State's comments during closing arguments made in response to defense counsel's remarks could not and did not prejudice the defendant.  We therefore find no reversible error.

¶ 85                                III.  CONCLUSION

¶ 86    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 87        Affirmed.