NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210560-U

NO. 4-21-0560

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 8, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Piatt County |
| RANDY A. YOUNKER, | ) | No. 19CF50 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rodney S. Forbes, |
| | ) | Judge Presiding. |

---

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion by admitting propensity evidence under
section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3
(West 2018)); the evidence was relevant, probative, and not unfairly prejudicial.

¶ 2    A jury convicted defendant, Randy A. Younker, of one count of predatory criminal

sexual assault of a child (720 ILCS 5/11-1.40 (a)(1) (West 2018)). The State's evidence included

the testimony of four other victims of defendant admitted on the State's motion under section 115-

7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)). The

evidence further included testimony by the complaining witness, also admitted under section

115-7.3, of an offense committed against her by defendant in a different county.

¶ 3    On appeal, defendant argues, "[T]he sheer volume, dissimilarity, and age of the

other-crimes evidence" the trial court admitted under section 115-7.3 was an abuse of discretion

and deprived him of a fair trial. He does not challenge the sufficiency of the evidence. The State argues no abuse of discretion occurred. We agree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On June 25, 2019, the State charged defendant with two counts of sex crimes against sisters Au. S. and Ad. S. The State alleged defendant had committed predatory criminal sexual assault of a child (720 ILCS 5/11-1.40 (a)(1) (West 2018)) against Au. S. by placing his finger in her vagina. It alleged he had committed aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (c)(1)(i) (West 2018)) against Ad. S. by fondling her sex organ. It alleged both offenses occurred between April 2017 and April 22, 2019, in Piatt County. The court severed the counts on defendant's motion. The State elected to proceed on the count involving Au. S.

¶ 6        The State filed five motions *in limine* invoking section 115-7.3 of the Code. It sought admission of evidence of other charged and uncharged offenses to show defendant's propensity, intent, and motive to commit the charged offense. The court considered each motion in turn.

¶ 7        First, the State sought to admit a certified copy of defendant's 2003 conviction of a count of aggravated criminal sexual abuse, which was based on his fondling of the breasts of A.Y., his daughter. It further sought to admit the testimony of A.Y. relating to incidents not resulting in convictions. A.Y. would testify defendant touched her vagina with his finger and put his finger in her vagina "on multiple occasions" when she was about seven or eight. When she was between 8 and 15 years old, defendant would touch her breasts both over and under her clothing. When she was 13 or 14, defendant began touching her leg and side when she and her brother were watching television with him. On one occasion, after A.Y.'s brother left the room, defendant placed A.Y.'s hand on his uncovered penis and moved it back and forth.

¶ 8          Defense counsel objected. Counsel conceded courts have admitted evidence of offenses committed more than 10 years before a charged offense but argued the court should deem this evidence unduly prejudicial because it "would really amount to piling on the scales of justice against my client at trial."

¶ 9          The court granted the motion. It found there was "proximity in time," although there was a "delay" which would "somewhat lessen the probative value of this evidence." It further found the incidents A.Y. was expected to describe were similar to that in the charge based on the ages of the victims, the type of abuse, the location of the abuse in residences, and the victims' status as family members. It therefore concluded the probative value of this evidence greatly outweighed any unfair prejudice to defendant.

¶ 10          Second, the State sought to admit the testimony of C.S. C.S.'s sister was formerly married to defendant, and defendant and C.S.'s sister lived in the same residence as C.S. for about three years. C.S. was nine in 1987, when defendant began dating her sister. She was also nine when he began touching her breasts and putting his hand under her clothing and placing his finger in her vagina. These incidents occurred "regularly" while she lived in the same residence as defendant and less frequently when she went to visit her sister when her sister and defendant were living elsewhere. When C.S. was about 13, defendant took her on a motorcycle ride to a park and had sexual intercourse with her while she tried to fight him off. She then began running away from home and thereafter had little contact with defendant.

¶ 11          Defense counsel argued the probative value of the testimony would be low because it would all relate to uncharged conduct.

¶ 12          The court granted this motion. Its analysis was essentially the same as for the first motion *in limine*. It noted the roughly 30-year gap between the incidents to which C.S. would

- 3 -

testify and the charged offense lessened the probative value of the evidence. However, this gap "[was] not fatal."

¶ 13    Third, the State sought to admit the testimony of L.C., C.S.'s daughter and a niece of defendant's ex-wife. In 2003, L.C. told a police officer that, when she was eight, she was in the living room of her aunt's house. Defendant grabbed her and put her in his lap. He put his hand beneath her underpants and touched her "private." He put his finger inside her "private" " 'a little.' " Something like this happened "multiple times" and sometimes it hurt. She reported these incidents to her mother and to a cousin.

¶ 14    Defense counsel objected, arguing the incidents at issue occurred 17 or 18 years before the incident here and the charges based on L.C.'s reports were dismissed, making admission of this evidence unfairly prejudicial.

¶ 15    The court's analysis again was essentially similar:

"Again, weighing the probative value of this evidence against the undue prejudice to the defendant, the Court has considered the proximity in time. The charged offense occurred approximately sixteen years after this alleged offense with [L.C.]. So it's older. That lessens the probative value. But again, that is not fatal. The Court is to look at the factual similarity of the events. In this case, there was a family relationship or frequent visits and contact with both alleged victims; that the defendant engaged in sexual conduct or abuse of the minor girls in their residence; that the girls were of similar age; and that [Au. S.] was ten to twelve and [L.C.] was between five and eight. In both instances the defendant is alleged to have committed similar sexual acts on the minor victim in that he used his fingers to touch or penetrate the victims' vaginas, and the defendant is significantly older than

- 4 -

the victim and a family member. Given the degree of factual similarity to the charge predicate offense I will allow the testimony of [L.C.] in this case. I do not find that it would unduly prejudice the defendant."

¶ 16       Fourth, the State sought to admit Au. S.'s testimony about an incident which resulted in a charge against defendant in Macon County. Au. S. would testify that when she was about 11, defendant and his wife—Au. S.'s grandmother—were staying with Au. S.'s immediate family. One morning, she and Ad. S. got into the bed defendant and her grandmother were sharing. Au. S. fell asleep. She woke to find defendant had his hand beneath her underpants and was rubbing her vagina.

¶ 17       Defense counsel argued, because defendant was facing charges in Macon County for the offense to which Au. S. would testify, "at a certain point we get to where essentially we're just piling on, and any probative value, Judge, is clearly outweighed by the undue prejudice to [defendant]."

¶ 18       The court granted the motion, noting the incident at issue was close in time to the charged incident and quite similar.

¶ 19       Fifth, the State sought to admit Ad. S.'s testimony concerning the conduct charged in the severed count. She would testify that, when defendant and her grandmother would visit, she would get into their bed in the morning. After her grandmother got up, defendant would touch her " 'under her stomach' "—an area which she identified as her vagina in a forensic interview—and move his hand around. This happened "multiple times."

¶ 20       Defense counsel argued it was inappropriate for the State to use evidence relating to a severed count. The court granted this motion, noting the incident was close in time and quite similar.

¶ 21        At defendant's jury trial, the State argued in its opening, "You are *** going to hear evidence that this is not the first time that [defendant] has done something like this."

¶ 22        The jury heard evidence defendant told the police he had not sexually touched Au. S. He told the police he believed Au. S.'s and Ad. S.'s claims were the result of the girls' father attempting to retain visitation. He also claimed Au. S. was angry because he had relayed her admission to having smoked marijuana to his wife.

¶ 23        Au. S. was 15 at the time of trial. She testified she saw her grandmother and defendant every weekend. One weekend around Thanksgiving, when she was about 11 or 12, she and Ad. S. got into bed between defendant and her grandmother, who were visiting her family in Decatur in Macon County. Defendant "slid his hand into [her] pants, and he started massaging [her] vagina area." She did not know how to react, so she "just laid there and just waited until it was done."

¶ 24        Later, Au. S.'s family visited her grandmother and defendant at their apartment in Monticello in Piatt County. She testified that at her grandparents' apartment, she was lying crosswise between defendant and her grandmother, watching a movie with her feet on defendant's lap. Their legs were covered by a blanket. Defendant slowly slid his hand up her leg. He pushed his hand under her shorts and underwear and put his finger into her vagina. This hurt, but she was afraid to say anything, even when defendant left for the bathroom. She could not remember whether anyone else was in the room at the time. When she and her family left, defendant whispered he was sorry. She did not disclose the incident to anyone because she was afraid of how her mother's boyfriend, Jason, would react.

¶ 25        On cross-examination, Au. S. said she believed her mother, Jason, and her brother JJ were probably present in the room, sitting on another couch. She also said Ad. S. might have

- 6 -

been sitting on the couch to the right of her grandmother. She knew her grandmother was awake during the incident because her grandmother asked defendant a question about the movie. She thought her family members had fallen asleep. She held still as defendant started touching her and during the sexual touching even though she was thinking about calling out to her grandmother or her mother.

¶ 26        Au. S. agreed she had denied being touched by defendant when her stepfather asked her whether any such incident had occurred. Au. S. also agreed she had told defendant she had smoked marijuana with her stepfather.

¶ 27        Alison Elsea, the senior forensic interviewer at the Child First Center in Decatur, authenticated a video recording of the interview she conducted with Au. S. and a transcript of that recording. The recording was shown with redactions to which the parties had agreed.

¶ 28        Au. S. was not quite 13 when the interview occurred and was in seventh grade. She reported to Elsea that Ad. S. was the first to disclose abuse by defendant. Au. S. and Ad. S. were staying in Kentucky with Au. S.'s stepfather, who was Ad. S.'s father. (Au. S. thought of her stepfather as her real father because he had been with her mother from when she was three months old. Her mother and her stepfather no longer lived together.) Ad. S. told her father defendant was abusing her. Ad. S.'s father then asked Au. S. if defendant had touched her. She denied any abuse, but she told Elsea the denial had been a lie.

¶ 29        Au. S. described the incident in Monticello to Elsea, explaining it occurred when her mother, Jason, and her brother JJ—who was "just a baby"—were dozing on the other couch. When prompted, she said Ad. S. was also there.

> "So they're dozing off. Everybody was like dozing off. And then I feel him start touching my legs, and then he started putting his hands up my shorts, and then

he was touching my private part, and then he put his finger in me, and it didn't feel good at all. It hurted [*sic*]. And I didn't move about it. In my head the whole time I was kind of saying [']stop, stop, stop.['] In my head I was yelling [']Mom.['] Like, I didn't know what to do."

Au. S. said the other name for her private part was vagina. She said her grandmother was dozing during the movie but then asked defendant a question about the movie while the abuse was occurring. He answered it as though nothing unusual was happening.

¶ 30    C.S. was 43 when she testified. Defendant had married C.S.'s sister, Crystal, in 1985 or 1986, but he had lived with Crystal for two years before the two married. When defendant and Crystal first started living together, the two stayed with C.S. in C.S.'s mother's house. C.S. was not quite nine when Crystal and defendant started dating, and Crystal was seven and a half years older than C.S. C.S. was nine when defendant started touching her vagina and breasts both over and under her clothing; this happened "[a]ll the time" when he was living in the same house with her. Defendant would start touching her whenever there was no one nearby. The touching continued until she was 15, but between the time she was 13 and 15, she "ran away a lot" to avoid defendant. (During some of this time, defendant and Crystal had their own home.) Defendant also would "pretty much make it to where like [she] was his girlfriend," which meant "basically like you're having sex." She tried to tell her mother about the abuse once early on, but, when her mother confronted defendant, "he played it like he didn't do anything wrong," and her mother did nothing more. Furthermore, C.S. was afraid reporting the abuse would be harmful to Crystal—she had observed that defendant was abusive to Crystal.

¶ 31        C.S. continued seeing Crystal in defendant's presence even after C.S. had her own children. She brought her children because she thought she was defendant's only victim. Nevertheless, she was careful to ensure her daughter was never alone with defendant.

¶ 32        After C.S.'s testimony, the court told the jury defendant had been convicted of aggravated criminal sexual abuse in a 2003 Macon County case; the count on which he was convicted stated he had fondled the breasts of A.Y. A.Y. was one of Crystal's two children with defendant.

¶ 33        A.Y. was 32 when she testified. She said that, from the time she was 7 until she turned 15 or 16, defendant touched her breasts and vagina. This happened too many times for her to count. He would take her into the bedroom and touch her. At first, he would touch her through her clothing, but later, he sometimes touched her under her clothing. These incidents sometimes occurred when other people were present but not watching. For instance, he touched her near her vagina under her swimsuit when they were in the water during a family expedition to a beach. There were other similar incidents. One morning when she was 15, she was in the house with her father and brother after her mother left for work. Defendant called her into his bedroom and asked her to rub his back. He got upset, she tried to leave, and he pulled her back and punched her in the face. He then pulled his pants down and tried to push her head toward his penis. When she refused the implied order, he pushed her hand onto his penis and had her "jack him off." She again tried to leave the room, but he pulled her back and told her he would kill her and her mother if she said anything. Further, she did not disclose the other abuse because she was afraid defendant was going to hurt her mother, whom he had threatened to hurt more than once. She said nothing until her cousin disclosed abuse and the police interviewed her.

¶ 34    L.C., C.S.'s daughter, was 26 when she testified. The family was close, so she saw Crystal and defendant regularly. She would often spend weekends at the house where defendant and Crystal lived with their son and their daughter A.Y. She described repeated acts of abuse by defendant, which, as best she could recall, started when she was four years old. The first time she could remember defendant abusing her, several family members were present in the same room but asleep. A.Y. was asleep next to her, and Crystal was also present but asleep. Defendant put his hands into her pants and told her to be quiet. On another occasion, she was awakened by defendant taking her out of her bedroom. He then tried to force his penis into her mouth. Defendant would often wait for times when the two were alone to try to pull her clothing down. When others left the room he was in, he would touch her breasts, her vaginal area, and her buttocks. L.C. said some form of abuse happened every time she went to defendant's house: "He would find any time that he could do something to [her], even if there were people in the house." The abuse went on for about four years. Defendant had threatened to kill her mother and her aunt, so she did not tell anyone about the abuse while it was still occurring. However, she later realized she did not have to fear defendant and disclosed the abuse.

¶ 35    Ad. S. was 11 at the time of the trial. When she was six or seven, she was in bed with defendant and her grandmother. Defendant touched her "under [her] stomach." She and defendant would "play around" or wrestle when her grandmother was out of the room and then "it" would happen. She was not sure how many times some form of abuse had happened, but she agreed it was more than five times. She had disclosed the abuse to her father when he asked whether anything had happened.

¶ 36    Defense counsel made no objections during trial to any evidence presented. Counsel did, however, object to the use of a transcript of Elsea's interview of Au. S.

¶ 37        The State rested after Ad. S.'s testimony. Defendant rested without presenting any evidence.

¶ 38        The court instructed the jury concerning the use of other-crimes evidence, stating, "Evidence has been received that the defendant has been involved in offenses other than that charged in the information." The court further advised the jury it should consider such evidence only for "the defendant's intent, motive, and propensity to commit sexual assaults." The jury found defendant guilty of the charged offense.

¶ 39        Defendant filed a posttrial motion in which he asserted, among other things, the court erred in granting all five motions *in limine*. He contended, "The Court failed to balance the State's requested evidence versus the unfairly prejudicial impact it would have on Defendant." He particularly objected to admission of Ad. S.'s testimony after he moved to sever the count involving her. The court rejected defendant's argument, stating it deemed the evidence was admissible for the reasons it stated when it granted the motions. The court noted, had the counts not been severed, the jury hearing both counts would likely have heard the forensic interview of Ad. S.

¶ 40        The court sentenced defendant to 38 years' imprisonment, and the State then dismissed the severed count. Defendant moved for reconsideration of his sentence, the court denied the motion, and defendant timely appealed.

¶ 41                               II. ANALYSIS

¶ 42        Defendant now argues the trial court abused its discretion by allowing other-crimes evidence to dominate the trial. He suggests, under the holding in *People v. Cardamone*, 381 Ill. App. 3d 462 (2008), a court must consider the *cumulative* effect of all the other-crimes evidence when it weighs the probative value of the evidence the State seeks to admit under section 115-7.3

- 11 -

against any undue prejudice to the defendant. Here, he contends the court should have limited the other-crimes evidence to "only that which was necessary to show a propensity," rather than admitting *all* the evidence the State sought to admit under section 115-7.3. Defendant further argues the court abused its discretion by admitting evidence of acts that were dissimilar to the charged act and evidence of acts from the distant past. Finally, he contends the State's case was highly dependent on the credibility of a single witness, Au. S., and this limitation prevents the evidence from being overwhelming; he thus argues the State cannot show the court's abuse of discretion was harmless beyond a reasonable doubt.

¶ 43        The State argues the court properly applied section 115-7.3 in granting each motion *in limine*. Further, *Cardamone* "is distinguishable, as the number of witnesses and uncharged acts presented in *Cardamone* dwarfs those here."

¶ 44        Under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by sections 115-7.3, 115-7.4, and 115-20 of the [Code]." See also *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Section 115-7.3 permits the use of evidence of other crimes in cases in which the defendant is accused of certain sex crimes (including predatory criminal sexual assault of a child); that section allows the trier of fact to consider such evidence, "if that evidence is otherwise admissible under the rules of evidence[,] *** for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(a)(1), (b) (West 2018). As Rule 404(b) indicates, propensity to commit sex offenses is one of those matters for which other-crimes evidence is admissible under section 115-7.3. See *Donoho*, 204 Ill. 2d at 176.

¶ 45        Section 115-7.3(c) provides:

"In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2018).

¶ 46    Our supreme court has urged trial courts "to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186. "When weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury." *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47. Nevertheless, a reviewing court should not overturn a decision to admit other-crimes evidence absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court. *Donoho*, 204 Ill. 2d at 182.

¶ 47    Defendant argues the trial court abused its discretion by admitting other-crimes evidence which, by exceeding the amount strictly necessary to show his propensity to commit sex offenses of the kind with which he was charged, suggested to the jury (in essence), he is an incorrigible sex offender. He suggests this was error under *Cardamone*. We deem *Cardamone* to be distinguishable.

¶ 48    In *Cardamone*, the defendant, a gymnastics coach, was charged with 26 counts of predatory criminal sexual assault of a child or aggravated criminal sexual abuse against 14

- 13 -

gymnastics students who trained at the gym where he coached. *Cardamone*, 381 Ill. App. 3d at 464. The State moved *in limine* under section 115-7.3 to allow testimony of uncharged conduct by the complainants and other witnesses; the court allowed the testimony by the complainants and one other witness. *Cardamone*, 381 Ill. App. 3d at 488. However, the court "excluded some of the State's requested evidence, namely, incidents that allegedly occurred with persons other than the complainants or outside of a gymnastics setting (*e.g.*, regarding [the] defendant's stepsister)." *Cardamone*, 381 Ill. App. 3d at 488. A jury found the defendant guilty of nine counts of aggravated criminal sexual abuse against seven complainants. *Cardamone*, 381 Ill. App. 3d at 488.

¶ 49 On appeal, the appellate court in *Cardamone* concluded the trial court had abused its discretion by admitting more evidence of uncharged conduct than was necessary to show the defendant's propensity to commit the offenses. *Cardamone*, 381 Ill. App. 3d at 493-94. The *Cardamone* court, examining *only* the uncharged conduct testified to by the seven complainants involved in the charges resulting in convictions, determined the jury had heard evidence of between 158 and 257 incidents of abuse from those witnesses (*Cardamone*, 381 Ill. App. 3d at 492); the range was the result of uncertainties in the complainants' testimony. The *Cardamone* court held the trial court should have considered other relevant circumstances in admitting evidence under section 115-7.3. Of most relevance here:

> "In the face of so many allegations of misconduct, there was a great risk that the jury could find that defendant must have done *something*, or that it could find defendant guilty beyond a reasonable doubt not of the charges but, instead, of uncharged acts." (Emphasis in original.) *Cardamone*, 381 Ill. App. 3d at 494.

¶ 50 Defendant is correct this case presents *a* parallel with *Cardamone* in that the jury heard more propensity evidence than it heard evidence of the charged offense. However, that

limited parallel fails to make *Cardamone* dispositive here. The discussion of *Cardamone* in *Perez* makes clear why no abuse of discretion occurred here. In short, "*Cardamone* was an extreme case" (*Perez*, 2012 IL App (2d) 100865, ¶ 49), and this case is not.

¶ 51        In *Perez*, the State charged the defendant with two counts of aggravated criminal sexual abuse against S.C. (the much younger sister of the defendant's girlfriend) and two counts of aggravated criminal sexual abuse against D.W. (the daughter of the defendant's girlfriend). *Perez*, 2012 IL App (2d) 100865, ¶¶ 4-5. The court severed the counts relating to the two victims. *Perez*, 2012 IL App (2d) 100865, ¶ 4. However, in the proceedings on the counts relating to S.C., the State sought admission of S.C.'s testimony about multiple uncharged incidents and D.W.'s testimony about the charged incidents in the severed matter. *Perez*, 2012 IL App (2d) 100865, ¶ 5. The court, interpreting *Donoho* and *Cardamone*, "determined that the statute and case law permitted introduction of the evidence" and therefore permitted the State to introduce the evidence. *Perez*, 2012 IL App (2d) 100865, ¶ 5.

¶ 52        At trial, S.C. testified to seven specific incidents or classes of incidents:

(1) One class of incidents of abuse occurred "more than five times" (*Perez*, 2012 IL App (2d) 100865, ¶ 10);

(2) Another class of incidents of abuse occurred "[o]n more than 10 occasions" (*Perez*, 2012 IL App (2d) 100865, ¶ 11);

(3) " '[M]ost every time' " S.C. was at her sister's house, the defendant would commit acts of abuse (*Perez*, 2012 IL App (2d) 100865, ¶ 11);

(4) "[A] 'couple' of times" the defendant waited for S.C. when she returned from school and tried to enter the house with her (*Perez*, 2012 IL App (2d) 100865, ¶ 12);

- 15 -

(5) Once, when S.C. was returning from school, the defendant came into her home with her and tried to forcibly hug her (*Perez*, 2012 IL App (2d) 100865, ¶ 12);

(6) The defendant once approached S.C. while she was ironing and "pushed his penis against her bottom, and wrapped his arms around her stomach" (*Perez*, 2012 IL App (2d) 100865, ¶ 13); and

(7) S.C. testified she told a detective, "[O]n about 18 occasions" the defendant climbed into bed with her and pressed his groin against her " 'butt' " and back (*Perez*, 2012 IL App (2d) 100865, ¶ 15).

Thus, S.C. testified to 37 incidents in total—assuming no overlap, but not attempting to quantify the incidents S.C. described as happening " 'most every time.' " *Perez*, 2012 IL App (2d) 100865, ¶ 11.

¶ 53    D.W. testified the "defendant would come up from behind [her], put his arms around her shoulders, and 'go down' to her stomach such that his arms and hands would touch her breasts"; "[t]his happened 'like 20' times." *Perez*, 2012 IL App (2d) 100865, ¶ 19. D.W.'s testimony brought the total incidents of which the jury heard testimony to approximately 57.

¶ 54    The jury found the defendant guilty of both charges. *Perez*, 2012 IL App (2d) 100865, ¶ 40. Defendant appealed, contending, *inter alia*, "that reversible error occurred where the majority of the State's case was comprised of other-crimes evidence." *Perez*, 2012 IL App (2d) 100865, ¶ 43.

¶ 55    The *Perez* court "recognized that *Cardamone*'s application of section 115-7.3 to the circumstances therein likely reflect[ed] the 'outer bounds' of the rule, leaving more 'subtle inner striations' to determining when the volume of other-crimes evidence admitted under section

115-7.3 becomes unduly prejudicial." *Perez*, 2012 IL App (2d) 100865, ¶ 49 (quoting *People v. Walston*, 386 Ill. App. 3d 598, 619 (2008)).

¶ 56 Further, the *Perez* court warned against giving undue weight to issues of undue prejudice in cases involving evidence introduced under section 115-7.3:

"[I]n general, the danger of unfair prejudice in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished by the very fact that section 115-7.3 upended the long-standing rule that other-crimes evidence to establish propensity is *per se* unfairly prejudicial—instead, introduction for propensity is actually proper. [Citation.] Thus, while undue prejudice *can* arise in a section 115-7.3 case, 'the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest, especially when combined with the highly deferential abuse-of-discretion standard that governs review of such trial court decisions.' [Citation.] Moreover, while the court must carefully consider the quantity of other-crimes evidence and be mindful of probative value and undue prejudice, it may consider that any undue prejudice of 'more thorough other-crimes evidence' admitted under section 115-7.3 will be 'less' unduly prejudicial than in a common-law other-crimes case. [Citation.]" (Emphasis in original.) *Perez*, 2012 IL App (2d) 100865, ¶ 49 (quoting *Walston*, 386 Ill. App. 3d at 619-22).

¶ 57 We conclude this case is most similar to *Perez*; it is not "an extreme case" (*Perez*, 2012 IL App (2d) 100865, ¶ 49), and no abuse of discretion occurred.

¶ 58 First, we agree with the State that the number of incidents presented to the jury here was qualitatively different in effect from the number in *Cardamone*. The *Cardamone* court

determined "the seven complainants upon whose allegations [the] defendant was convicted testified that [the] defendant committed between 158 and 257 uncharged acts." *Cardamone*, 381 Ill. App. 3d at 491. Further, because the *Cardamone* court attempted to enumerate *only* the incidents testified to by the seven complainants whom the jury found the defendant guilty of abusing, the total number of incidents of which the *Cardamone* jury heard testimony likely numbered in the multiple hundreds. Here, defendant makes no attempt to enumerate the number of incidents, but points instead to the State's reliance on the witnesses' testimony to *patterns* of abuse. Thus, when defendant tabulates the incidents used as propensity evidence, he notes Au. S.'s testimony to one act, C.S.'s testimony to acts occurring " '[a]ll the time' " from ages 9 to 15, A.Y.'s testimony to acts occurring " '[t]oo many times to count' " from ages 7 to 16, L.C.'s testimony to acts occurring "from ages 4 to 8" " '[e]very time' " she made one of her regular weekend visits to defendant's house, and Ad. S.'s testimony to acts occurring " '[m]ore than five times' " when she was 7. Although this testimony might leave the impression of a large number of acts, the jury could not have reasonably supposed the witnesses were describing multiple hundreds of acts. The evidence here was more akin to the approximately 57 acts described in *Perez*.

¶ 59 Second, in contrast to *Cardamone*, little risk existed the jury "could find defendant guilty beyond a reasonable doubt not of the charges but, instead, of uncharged acts." *Cardamone*, 381 Ill. App. 3d at 494. Much of the propensity evidence came from adult witnesses who obviously were not the victim of the charged offense. Nothing in the trial proceedings suggests the jury could have believed Ad. S. was the victim of the charged offense. Au. S. testified to a single uncharged offense, one occurring in Macon County, not Piatt County. This stands in contrast to *Cardamone*, in which the jury heard 14 complaining witnesses testify to 26 charges, but also hundreds of

uncharged offenses, circumstances greatly increasing the probability the jury would lose track of what evidence was propensity evidence and what evidence described charged offenses.

¶ 60       Defendant argues, factual differences between this case and *Cardamone* aside, under the rule in *Cardamone*, the trial court was required to act to limit the predisposition evidence to "only that which was necessary to show a propensity." In effect, he argues, "In the face of so many allegations of misconduct, there was a great risk that the jury could find that defendant must have done *something*." (Emphasis in original.) *Cardamone*, 381 Ill. App. 3d at 494. He thus contends the court erred when it permitted the State to introduce evidence beyond the quantity it needed to make its legitimate case; he suggests the admission of older and dissimilar propensity evidence was particularly unnecessary.

¶ 61       We disagree with defendant. First, we emphasize all the evidence was highly probative in that it demonstrated defendant's persistent propensity to opportunistically abuse his young female relatives. It was thus for the court to decide in its discretion precisely how much of this evidence to admit. As the *Cardamone* court conceded, when propensity evidence is probative, "it is difficult to determine precisely where to draw the line" as to when such evidence becomes excessive. *Cardamone*, 381 Ill. App. 3d at 497. But, as *Perez* suggests, when the highly deferential abuse-of-discretion standard is combined with the lessened undue prejudice associated with evidence admitted under section 115-7.3, the actual limits on the propensity evidence admitted under section 115-7.3 are necessarily quite narrow, and findings of an abuse of discretion should generally be limited to extreme cases—such as *Cardamone*. *Perez*, 2012 IL App (2d) 100865, ¶ 49. For the reasons we have stated, this was not such a case.

¶ 62       Beyond objecting to the volume of the other-crimes evidence, defendant contends that the specifics of the other-crimes evidence denied him a fair trial for two reasons. First,

defendant argues the court abused its discretion by admitting evidence of acts that were dissimilar to the charged act: "[E]ven though the charged offense was a single act, without a threat of force element, the State elicited evidence of threats of force from two witnesses, A.Y. and L.C., that [defendant] threatened to kill them and their family." Second, defendant argues the court abused its discretion by admitting evidence of acts from the distant past: "[T]hree of the other-crimes witnesses, C.S., A.Y., and L.C., testified to events that happened decades ago, over periods of years, rendering the testimony especially prejudicial and difficult to defend against." We find these arguments unpersuasive.

¶ 63        Initially, we deem defendant, by failing to offer cogent argument and include citations to relevant authorities, has forfeited his assertion that some of the evidence related to acts that were too dissimilar to the charged act. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). To be sure, defendant notes, under section 115-7.3(c)(2), a court must consider, among other things, "the degree of factual similarity to the charged or predicate offense." 725 ILCS 5/115-7.3(c)(2) (West 2018). However, nowhere in his brief does defendant cite any authority addressing when other-crimes evidence becomes so dissimilar as to cause unfair prejudice.

¶ 64        Forfeiture aside, the other crimes evidence was consistent with the standard set out in *Donoho*: "to be admissible, other-crimes evidence must have 'some threshold similarity to the crime charged.' " *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). Here, all the other-crimes evidence related to defendant's abuse of young female relatives, primarily by digital penetration of the vagina, touching near the vagina, or touching of breasts. We acknowledge the alleged dissimilarity, specifically the "threat of force element," but note the other-crimes evidence must have only " '*some* threshold similarity to the crime charged.' " (Emphasis added.) *Donoho*, 204 Ill. 2d at 184 (quoting *Bartall*, 98 Ill. 2d at 310). We conclude the

trial court's decision to admit the other crimes evidence was not arbitrary, fanciful, or unreasonable.

¶ 65        Second, we disagree that it was an abuse of discretion for the court to admit other-crimes evidence that occurred years before the charged conduct. "[The] admissibility of other-crimes evidence should not *** be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." (Internal quotation marks omitted.) *Donoho*, 204 Ill. 2d at 183. "Instead, courts should evaluate this issue on a case-by-case basis." *Donoho*, 204 Ill. 2d at 183. The supreme court has declined to adopt a bright-line rule about when prior acts are *per se* too old to be admitted under section 115-7.3. *Donoho*, 204 Ill. 2d at 183-84.

¶ 66        According to the information, the act for which defendant was charged took place over a period of time, specifically April 2017 to April 22, 2019. Likewise, C.S., A.Y., and L.C. testified as to similar acts that occurred over a period of time, approximately 14 to 30 years prior to the conduct at issue in this case.

¶ 67        "The appellate court has affirmed admission of other-crimes evidence of over 20 years old under the exceptions because the court found it to be sufficiently credible and probative." *Donoho*, 204 Ill. 2d at 184; see also *People v. Lobdell*, 2017 IL App (3d) 150074, ¶¶ 21-22 (affirming the admission of a rape conviction from nearly 30 years before the charged criminal sexual assault). Therefore, while the passage of 14 to 30 years since the prior offense may lessen its probative value, "standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it." *Donoho*, 204 Ill. 2d at 184.

¶ 68        We acknowledge the acts to which C.S. testified are near the limits for the age of acts that have been allowed as evidence under section 115-7.3. However, given the overall similarity of her experiences to those of Au. S., the pattern her testimony helped to establish was

highly probative. The State was correct about what the other-crimes evidence tended to show when it argued, "[Defendant has] been doing things like this most of his adult life." This other-crimes evidence was highly probative of defendant's propensity to opportunistically abuse his younger female relatives.

¶ 69                                      III. CONCLUSION

¶ 70          For the reasons stated, we affirm the judgment of the circuit court of Piatt County.

¶ 71          Affirmed.